# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 1:18-cv-01766 |
| U.S. DEPARTMENT OF JUSTICE | ) ) ) |
| Defendant. | ) ) ) |

**DECLARATION OF OFELIA C. PEREZ**

I, Ofelia C. Perez, do hereby declare:

1.      I am a Government Information Specialist for the Office of the Inspector General, United States Department of Justice (OIG), Washington, D.C.  Due to the nature of my official duties, I am familiar with the procedures followed in processing requests received by the OIG pursuant to 5 U.S.C. § 552, commonly known as the Freedom of Information Act (FOIA), and with the OIG's responses to the FOIA requests at issue in this case.  The statements in this declaration are based upon my personal knowledge and experience and upon information made available to me in the course of my official duties.

2.      Among other duties, the OIG is responsible for "[i]nvestigat[ing] allegations of criminal wrongdoing and administrative misconduct on the part of Department [of Justice] employees," 28 C.F.R. § 0.29a (b) (2), and for

"[u]ndertak[ing] sensitive investigations of Department operations and/or personnel, often at the request of senior Department officials or Congress." Id. at § 0.29a (b)(4). In particular, the OIG's Oversight and Review Division blends the skills of attorneys, investigators, program analysts, and paralegals to conduct these special reviews and investigations of sensitive allegations involving Department employees and operations. One example of such an investigation is detailed in, "A Report of Investigation of Certain Allegations Relating to Former FBI Deputy Director Andrew McCabe" (McCabe Report), dated February 2018, and publicly released by the OIG on its website on April 13, 2018 (Exhibit 1).

3.     In connection with its duties as stated above, the OIG maintains records relating to complaints of misconduct received by the OIG and to any investigations of those complaints conducted by the OIG.

4.     Department of Justice regulations specify that when reviewing records located by a Department component in response to a request, the component shall determine whether another component or federal government agency is better able to determine whether the record is exempt from disclosure under the FOIA. 28 C.F.R. § 16.4(d). Department regulations further specify that, "[w]hen the component processing the request believes that a different component, agency, or Federal Government office is best able to determine whether to disclose the record, the component typically should refer the responsibility for responding to the request regarding that record," and that "[o]rdinarily, the component or agency that originated the record will be

presumed to be best able to make the disclosure determination." Id. at §
16.4(d)(2).

5.     The OIG received a FOIA referral from the Federal Bureau of
Investigation (FBI).  The FBI indicated that the referral related to a March 19,
2018 FOIA request from the Plaintiff in this litigation, Citizens for
Responsibility and Ethics in Washington (CREW), which request sought "all
documents related to any investigation or inquiry conducted by the FBI's Office
of Professional Responsibility ("OPR") of, involving, or relating to former FBI
Deputy Director Andrew McCabe, who was fired by Attorney General Jeff
Sessions on March 16, 2017."  The FBI stated that, while reviewing records
responsive to Plaintiff's FOIA request, it had located the enclosed documents
that had originated with the OIG.  The FBI further stated that the documents
were being referred to the OIG for direct response to the requester.

6.     Over a period of months, the FBI referred additional documents to the
OIG in connection with Plaintiff's FOIA request.  In total, the documents that
the FBI referred for processing by the OIG in connection with CREW's FOIA
request consist of over 1,000 pages of material.  The FBI indicated that the
referred documents consisted of transcripts of interviews; correspondence;
notes; telephone records, emails, and texts; a memorandum of investigation;
sworn statements (unsigned drafts and signed versions); and newspaper
articles.

7.     Of the materials referred to the OIG by the FBI in connection with
Plaintiff's FOIA request, I reviewed a representative sample of documents that

had been agreed upon by counsel in this litigation.  This representative sample

is comprised of a 50-page transcript; ten pages of correspondence; five pages of

handwritten notes; 15 pages of phone records, emails and texts; a three page

Memorandum of Investigation (MOI); and 20 pages of a sworn statement.

8.      On December 21, 2018, the OIG provided an interim response to

Plaintiff's request.  The OIG released the transcript, consisting of 50 pages with

redactions.  (Exhibit 2)  The redacted material was withheld from disclosure

pursuant to exemptions 6, 7(A), and 7(C).  On February 25, 2019, the OIG

provided Plaintiff with the remainder of its response concerning the

representative sample.  The OIG released 53 pages of documents with

redactions, comprised of the correspondence; the handwritten notes; the phone

records, emails, and texts; the MOI; and the portion of a sworn statement.

(Exhibit 3)  The redacted material was withheld from disclosure pursuant to

exemptions 6, 7(A), 7(C), and 7(E).

9.      I understand that, at this time, the parties are only litigating the

application of exemption 7(A) to the representative sample.  Accordingly, I will

address only the OIG's process in applying exemption 7(A) to this sample and

will not presently address the OIG's application of exemptions 6, 7(C), or 7(E).

10.     In processing the documents in the representative sample, I first

reviewed the McCabe Report.  Because the McCabe Report is publicly available,

I determined that any portion of the documents in the representative sample

that was the source for information in the McCabe Report was not subject to

protection and must be released.  With respect to the remainder of the

information in the documents, I considered whether the underlying information

was properly exempt from disclosure under any FOIA exemptions.

11.     FOIA exemption 7(A) protects from disclosure "records or information

compiled for law enforcement purposes, but only to the extent that the

production of such law enforcement records or information (A) could

reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. §

(b)(7)(A). Thus, to invoke FOIA exemption 7(A), the OIG had to make a

determination that the referred documents relating to Plaintiff's request were

compiled for "law enforcement purposes." The OIG is vested with authority to

investigate allegations of misconduct by Department employees.  In this case,

as detailed in the McCabe Report, the OIG's investigation was a misconduct

investigation. McCabe Report at 1. As stated in the Report, the FBI's

Inspection Division (INSD) had been investigating whether information

published in the Wall Street Journal in an October 30 article was an

unauthorized leak and, if so, who was the source of the leak. Id. The OIG

opened an investigation of McCabe on August 31, 2017, following INSD's

referral of its matter to the OIG after the INSD became concerned that McCabe

may have lacked candor when questioned by INSD agents about his role in the

disclosure to the Wall Street Journal. Id. As detailed in the McCabe Report, in

addition to addressing whether McCabe lacked candor, the OIG's misconduct

investigation addressed whether any FBI or Department of Justice policies were

violated in disclosing non-public information to the Wall Street Journal. Id. As

further detailed in the McCabe Report, through its investigation, the OIG

ultimately concluded that then-Deputy Director McCabe lacked candor,

including under oath, on multiple occasions in connection with describing his

role in connection with a disclosure to the Wall Street Journal. Id. at 35. The

OIG records at issue in this litigation are records from the OIG misconduct

investigation of McCabe. With this background, the OIG concluded that the

documents qualified as having been compiled for "law enforcement purposes"

under exemption 7(A).

12.    In addition, in order to invoke FOIA exemption 7(A), there must be a

determination that production of the records or information could reasonably

be expected to interfere with enforcement proceedings. OIG Special Agent

Stephen Lyons has confirmed that disclosure of information in the documents

of the representative sample could reasonably be expected to interfere with

ongoing or future enforcement proceedings. In light of this conclusion, the OIG

has concluded that the withheld information in the documents of the

representative sample was properly exempt from disclosure under FOIA

exemption 7(A), with one exception. OIG initially withheld several exhibits to a

sworn statement under Exemption 7(A). It is withdrawing its invocation of

Exemption 7(A) with respect to Exhibits 2 and 3 to the sworn statement, which

OIG will re-process.

13.    Pursuant to the above analysis, the OIG has released all portions of said

documents that can reasonably be segregated from exempt material.

Specifically, in determining what portions of the documents in the

representative sample were publicly disclosed in the McCabe Report and,

therefore, were not subject to protection and must be released, I conducted a line-by-line review of each document. I compared the otherwise exempt portion of the document to the corresponding portions of the McCabe Report, to ensure that any material that was either quoted or fairly summarized in the McCabe Report was not redacted in each sample document, notwithstanding that it would otherwise be exempt from disclosure.  This process was a labor-intensive and time-consuming one that required me to conduct a careful analysis of the underlying material.  In addition, in my line-by-line review, I determined that certain information was not subject to any applicable exemption and could reasonably be segregated from exempt material.  Such non-exempt material has also been segregated and released from the sample documents.

Pursuant to Title 28 U.S.C. § 1764, I declare under penalty of perjury that the foregoing is true and correct.

Dated:      March ____21____, 2019
            Washington, D.C.


                                        Ofelia C. Perez



## Office of the Inspector General
### U.S. Department of Justice

**OVERSIGHT ★ INTEGRITY ★ GUIDANCE**



## REDACTED

# A Report of Investigation of Certain Allegations Relating to Former FBI Deputy Director Andrew McCabe

**Redactions have been made based on privacy interests of individuals**

Oversight & Review Division                    February 2018

# Table of Contents

I.    Introduction and Summary of Findings .................................................... 1

II.    Relevant Statutes, Policies, and Practices ............................................... 3

    A.    Lack of Candor ............................................................................. 3

    B.    FBI Policies and Practices Regarding Media Contacts and Leaks ......... 3

III.    Factual Findings ................................................................................. 4

    A.    Background Facts ......................................................................... 4

          1.    Andrew McCabe ................................................................ 4
          2.    The Clinton E-mail Investigation ......................................... 4
          3.    The Clinton Foundation Investigation ................................... 5

    B.    Events Leading to the October 30 Article and its Aftermath .............. 5

          1.    Comey Refuses To Confirm the Existence of the CF Investigation (July 7) or Other Investigations (September 28) ................................................................. 5
          2.    McCabe–PADAG Call on the CF Investigation (August 12) ........ 5
          3.    The October 23 WSJ Article and Aftermath ........................... 5
          4.    The Attorney General Expresses Strong Concerns to McCabe and other FBI Officials about Leaks, and McCabe Discusses Recusing Himself from CF Investigation (October 26) ............. 6
          5.    McCabe Is Excluded from a Meeting Regarding Clinton E-mails Found on the Weiner Laptop (October 27) ............................. 7
          6.    McCabe Authorizes Special Counsel and AD/OPA To Talk to Barrett Regarding CF Investigation and To Disclose August 12 McCabe-PADAG Call .......................................................... 8
          7.    The October 30 WSJ Article ................................................ 9
          8.    McCabe Admonishes Two FBI Executives for Leaks in the October 30 WSJ Article Regarding the CF Investigation ......... 11
          9.    Comey Expresses Concern About Leaks at his Staff Meeting and Discusses the October 30 WSJ Article with McCabe (October 31) ................................................................... 11
          10.    Knowledge of Other FBI Executives .................................... 13
          11.    McCabe Admonishes NY-ADIC for CF Investigation Leaks Following November 3 WSJ Article (November 4) ................. 14
          12.    INSD Opens an Investigation of the WSJ Leak (May 2017) ..... 14
          13.    INSD Interviews McCabe under Oath on May 9 .................... 15
          14.    McCabe's Initial Account under Oath to the OIG on July 28, 2017 ................................................................... 18
          15.    McCabe Calls the OIG on August 1 To Correct his Testimony .. 19
          16.    INSD and the OIG Interview Special Counsel under Oath Regarding the October 30 Article (August 7, September 7, October 26) ................................................................... 20

      17.    INSD Interviews McCabe Again (August 18)........................ 20

      18.    The OIG Assumes Responsibility for the Investigation (August 31) ................................................................ 21

      19.    The OIG Interviews McCabe under Oath on November 29 ...... 21

IV.    OIG Analysis ................................................................................. 22

    A.    Lack of Candor ....................................................................... 22

      1.    Lack of Candor with Then-Director Comey on or around October 31, 2016.................................................... 22

      2.    Lack of Candor in Interview under Oath with INSD Agents on May 9, 2017 ............................................... 27

      3.    Lack of Candor in Interview under Oath with OIG Investigators on July 28, 2017 ..................................... 29

      4.    Lack of Candor in Interview under Oath with OIG Investigators on November 29, 2017 .......................... 31

    B.    Media Policies......................................................................... 32

    C.    Conclusion ............................................................................. 35

## I.     Introduction and Summary of Findings

This misconduct report addresses the accuracy of statements made by then-Federal Bureau of Investigation (FBI) Deputy Director Andrew McCabe to the FBI's Inspection Division (INSD) and the Department of Justice (Department or DOJ) Office of the Inspector General (OIG) concerning the disclosure of certain law enforcement sensitive information to reporter Devlin Barrett that was published online in the Wall Street Journal (WSJ) on October 30, 2016, in an article entitled "FBI in Internal Feud Over Hillary Clinton Probe."  A print version of the article was published in the WSJ on Monday, October 31, 2016, in an article entitled "FBI, Justice Feud in Clinton Probe."

This investigation was initially opened by INSD to determine whether the information published by the WSJ in the October 30 article was an unauthorized leak and, if so, who was the source of the leak.  On August 31, 2017, the OIG opened an investigation of McCabe following INSD's referral of its matter to the OIG after INSD became concerned that McCabe may have lacked candor when questioned by INSD agents about his role in the disclosure to the WSJ.  Shortly before that INSD referral, as part of its ongoing Review of Allegations Regarding Various Actions by the Department and the FBI in Advance of the 2016 Election, the OIG identified FBI text messages by McCabe's then-Special Counsel ("Special Counsel") that reflected that she and the then-Assistant Director for Public Affairs ("AD/OPA") had been in contact with Barrett on October 27 and 28, 2016, and the OIG began to review the involvement of McCabe, Special Counsel, and AD/OPA in the disclosure of information to the WSJ in connection with the October 30 article.

In addition to addressing whether McCabe lacked candor, the OIG's misconduct investigation addressed whether any FBI or Department of Justice policies were violated in disclosing non-public FBI information to the WSJ.

The OIG's misconduct investigation included reviewing all of the INSD investigative materials as well as numerous additional documents, e-mails, text messages, and OIG interview transcripts.  The OIG interviewed numerous witnesses, including McCabe, Special Counsel, former FBI Director James Comey, and others.

As detailed below, we found that in late October 2016, McCabe authorized Special Counsel and AD/OPA to discuss with Barrett issues related to the FBI's Clinton Foundation investigation (CF Investigation).  In particular, McCabe authorized Special Counsel and AD/OPA to disclose to Barrett the contents of a telephone call that had occurred on August 12, 2016, between McCabe and the then-Principal Associate Deputy Attorney General ("PADAG").  Among the purposes of the disclosure was to rebut a narrative that had been developing following a story in the WSJ on October 23, 2016, that questioned McCabe's impartiality in overseeing FBI investigations involving former Secretary of State Hillary Clinton, and claimed that McCabe had ordered the termination of the CF Investigation due to Department of Justice pressure.  The disclosure to the WSJ effectively confirmed the existence of the CF Investigation, which then-FBI Director Comey had

previously refused to do.  The account of the August 12 McCabe-PADAG call, and other information regarding the handling of the CF Investigation, was included in the October 30 WSJ article.

We found that, in a conversation with then-Director Comey shortly after the WSJ article was published, McCabe lacked candor when he told Comey, or made statements that led Comey to believe, that McCabe had not authorized the disclosure and did not know who did.  This conduct violated FBI Offense Code 2.5 (Lack of Candor – No Oath).

We also found that on May 9, 2017, when questioned under oath by FBI agents from INSD, McCabe lacked candor when he told the agents that he had not authorized the disclosure to the WSJ and did not know who did.  This conduct violated FBI Offense Code 2.6 (Lack of Candor – Under Oath).

We further found that on July 28, 2017, when questioned under oath by the OIG in a recorded interview, McCabe lacked candor when he stated:  (a) that he was not aware of Special Counsel having been authorized to speak to reporters around October 30 and (b) that, because he was not in Washington, D.C., on October 27 and 28, 2016, he was unable to say where Special Counsel was or what she was doing at that time.  This conduct violated FBI Offense Code 2.6 (Lack of Candor – Under Oath).

We additionally found that on November 29, 2017, when questioned under oath by the OIG in a recorded interview during which he contradicted his prior statements by acknowledging that he had authorized the disclosure to the WSJ, McCabe lacked candor when he: (a) stated that he told Comey on October 31, 2016, that he had authorized the disclosure to the WSJ; (b) denied telling INSD agents on May 9 that he had not authorized the disclosure to the WSJ about the PADAG call; and (c) asserted that INSD's questioning of him on May 9 about the October 30 WSJ article occurred at the end of an unrelated meeting when one of the INSD agents pulled him aside and asked him one or two questions about the article.  This conduct violated FBI Offense Code 2.6 (Lack of Candor – Under Oath).

Lastly, we determined that as Deputy Director, McCabe was authorized to disclose the existence of the CF Investigation publicly if such a disclosure fell within the "public interest" exception in applicable FBI and DOJ policies generally prohibiting such a disclosure of an ongoing investigation.  However, we concluded that McCabe's decision to confirm the existence of the CF Investigation through an anonymously sourced quote, recounting the content of a phone call with a senior Department official in a manner designed to advance his personal interests at the expense of Department leadership, was clearly not within the public interest exception.  We therefore concluded that McCabe's disclosure of the existence of an ongoing investigation in this manner violated the FBI's and the Department's media policy and constituted misconduct.

The OIG is issuing this report to the FBI for such action as it deems appropriate.

## II.  Relevant Statutes, Policies, and Practices

### A.  Lack of Candor

The Offense Codes Applicable to the FBI's Internal Disciplinary Process punish FBI employees for "lack of candor."  Offense Code 2.5 (Lack of Candor – No Oath) prohibits "[k]nowingly providing false information when making a verbal or written statement, not under oath, to a supervisor, another Bureau employee in an authoritative position, or another governmental agency, when the employee is questioned about his conduct or the conduct of another person."  Offense Code 2.6 (Lack of Candor – Under Oath) prohibits "[k]nowingly providing false information in a verbal or written statement made under oath."  Under both offense codes, lack of candor is defined to include "false statements, misrepresentations, the failure to be fully forthright, or the concealment or omission of a material fact/information."

### B.  FBI Policies and Practices Regarding Media Contacts and Leaks

The then-existing FBI Policy on Media Relations, Section 3.1, authorized the FBI Director, the FBI Deputy Director, the Associate Deputy Director, and the Assistant Director for the Office of Public Affairs (OPA) to speak with the media on behalf of the FBI.  Other FBI executives could only speak with the media "at OPA's request or following coordination with, and approval by, OPA at FBIHQ."  Section 3.4 of this policy provided, in relevant part, that disclosures to the media "must not address an ongoing investigation" except as indicated in that section.  The section provides two examples of when it "may be permissible to selectively release [non-classified] information to assure the public that an investigation is in progress" with prior approval of specific components at FBI headquarters:

(1)  to protect the public interest, welfare or safety

(2)  to solicit information from the public that might be relevant to an investigation.

Section 3.3 of the policy also provides that all releases must be consistent with all applicable laws and regulations and policy as itemized in Section 5, which includes the United States Attorneys' Manual (USAM), Title 1-7.000, "Media Relations."  Title 1-7.000 of the USAM establishes specific guidelines for the release of information relating to criminal and civil cases by the FBI and other DOJ components.  The USAM guidelines expressly state that they are consistent with 28 C.F.R. § 50.2, which provides that "where background information or information relating to the circumstances of an arrest or investigation would be highly prejudicial or where the release thereof would serve no law enforcement function, such information should not be made public."  28 C.F.R. § 50.2(a)(3)(iv).

Among other things, Section 1-7.530 of the USAM provides that:

A.  Except as provided in subparagraph B., of this section, components and personnel of the Department of Justice shall not respond to questions about the existence of an ongoing investigation or comment on its nature

3

or progress, including such things as the issuance or serving of a subpoena, prior to the public filing of the document.

B.  In matters that have already received substantial publicity, or about which the community needs to be reassured that the appropriate law enforcement agency is investigating the incident, or where the release of information is necessary to protect the public interest, safety or welfare, comments about or confirmation of an ongoing investigation may need to be made.  In these unusual circumstances, the involved investigative agency will consult and obtain approval from the United States Attorney or Department Division handling the matter prior to disseminating any information to the media.

James Comey, who was the FBI Director at the time the WSJ article was published, told the OIG that the authority to disclose the existence of a pending investigation is "confined to the Director and the Deputy Director" and that in making such decisions "the default is we don't talk" about pending investigations. He also told the OIG that "significant disclosures about investigations . . . always go through me" and that he could not remember any disclosure by any of the three Deputy Directors that served under him during his tenure that did not involve "close coordination" with him.  Comey also told the OIG that the FBI does not disclose "a criminal investigation . . . anonymously sourced in a newspaper."

## III.   Factual Findings

### A.   Background Facts

#### 1.   Andrew McCabe

McCabe began his career with the FBI in 1996 as a Special Agent in the New York Field Office.  McCabe has served in a variety of leadership positions in the FBI during his career, including as the Assistant Director of the Counterterrorism Division, the Executive Assistant Director of the National Security Branch, and the Assistant Director in Charge of the FBI's Washington Field Office.  On February 1, 2016, McCabe was appointed Deputy Director of the FBI, overseeing all FBI domestic and international investigative and intelligence activities.  McCabe became Acting Director of the FBI on May 9, 2017, when FBI Director James Comey was fired.  McCabe served as Acting Director until August 1, 2017, when Christopher Wray was confirmed by the Senate as the new FBI Director.  At that time, McCabe resumed his duties as Deputy Director, a position he held until January 29, 2018.

#### 2.   The Clinton E-mail Investigation

The Clinton E-mail Investigation began as a referral from the Inspector General of the Intelligence Community concerning Clinton's use of a personal e-mail server during her time as Secretary of State.  On July 5, 2016, Comey publicly announced the FBI's recommendation to the Department that "no charges are appropriate in this case."  On July 6, 2016, Attorney General Loretta Lynch

announced that no charges would be brought related to the investigation.  On October 28, 2016, two days before the online publication of the WSJ article at issue in this report, Comey informed Congress that the FBI had discovered additional Clinton-related e-mails in an unrelated investigation.  On November 6, 2016, Comey announced that the FBI had completed its review of the additional e-mails and that "we have not changed our conclusions that we expressed in July with respect to Secretary Clinton."

### 3. The Clinton Foundation Investigation

As detailed below, the disclosures by Special Counsel to the WSJ on October 27 and 28 included statements effectively confirming the existence of the CF Investigation.  Prior to October 27 and 28, the FBI had not publicly confirmed the existence of the CF Investigation, or issued any statements to the media discussing the details of that investigation.

### B. Events Leading to the October 30 Article and its Aftermath

### 1. Comey Refuses To Confirm the Existence of the CF Investigation (July 7) or Other Investigations (September 28)

In testimony before the House Oversight and Government Reform Committee on July 7, 2016, FBI Director Comey refused to answer questions about whether the FBI was investigating the Clinton Foundation.  Comey stated that he was "not going to comment on the existence or nonexistence" of the CF Investigation.  Similarly, in testimony before the House Judiciary Committee on September 28, 2016, Comey refused to confirm or deny two different investigations during an FBI oversight hearing.  He stated:  "our standard is we do not confirm or deny the existence of investigations."

### 2. McCabe–PADAG Call on the CF Investigation (August 12)

McCabe told the OIG that on August 12, 2016, he received a telephone call from PADAG regarding the FBI's handling of the CF Investigation (the "PADAG call").  McCabe said that PADAG expressed concerns about FBI agents taking overt steps in the CF Investigation during the presidential campaign.  According to McCabe, he pushed back, asking "are you telling me that I need to shut down a validly predicated investigation?"  McCabe told us that the conversation was "very dramatic" and he never had a similar confrontation like the PADAG call with a high-level Department official in his entire FBI career.

### 3. The October 23 WSJ Article and Aftermath

On October 23, 2016, the WSJ published online an article by reporter Devlin Barrett stating that a political-action committee (PAC) run by Virginia Governor Terry McAuliffe and the Virginia Democratic Party (over which the article reported McAuliffe "exerts considerable control") collectively donated nearly $675,000 to the

2015 unsuccessful state senate campaign of the wife of Andrew McCabe.[1]  The article described McAuliffe as "an influential Democrat with long-standing ties to Bill and Hillary Clinton" and noted that McCabe was an FBI official "who later helped oversee the investigation into Mrs. Clinton's email use."  The article contained an official FBI statement that McCabe "played no role" in his wife's 2015 state senate campaign and was promoted to FBI Deputy Director months after his wife's defeat "where, . . . he assumed for the first time, an oversight role in the investigation into Secretary Clinton's emails."  According to the article, FBI officials stated that McCabe's supervision of the Clinton E-mail case in 2016 did not present a conflict or ethics issues because his wife's campaign was over by then.  The article went on to note that when the Clinton E-mail Investigation was launched in July 2015, Mr. McCabe was "running the FBI's Washington, D.C., field office, which provided personnel and resources to the Clinton email probe."

Immediately following online publication of the article, there was substantial public discussion as to whether McCabe's oversight of the Clinton E-mail Investigation had been appropriate in light of the information in the article.[2]  Additionally, on October 24, 2016, Barrett e-mailed the AD/OPA about a follow-on story that he was working on.  In that e-mail, Barrett asked AD/OPA a number of questions about McCabe's involvement in certain matters, including the CF Investigation.  In particular, Barrett's e-mail said that he was told that:

> in the summer, McCabe himself gave some instruction as to how to proceed with the Clinton Foundation probe, given that it was the height of election season and the FBI did not want to make a lot of overt moves that could be seen as going after [Clinton] or drawing attention to the probe.

Barrett's e-mail asked AD/OPA "[h]ow accurate are those descriptions?  Anything else I should know?"  As detailed in Section 6 below, McCabe subsequently instructed Special Counsel to provide information to Barrett for the follow-on story.

### 4. The Attorney General Expresses Strong Concerns to McCabe and other FBI Officials about Leaks, and McCabe Discusses Recusing Himself from CF Investigation (October 26)

McCabe told the OIG that during the October 2016 time frame, it was his "perception that there was a lot of information coming out of likely the [FBI's] New York Field Office" that was ending up in the news.  McCabe told the OIG that he "had some heated back-and-forths" with the New York Assistant Director in Charge ("NY-ADIC") over the issue of media leaks.

---

[1]  A print version of the article was published in the WSJ on Monday, October 24, 2016.

[2]  In January 2017, the OIG announced it would conduct a review of allegations regarding various actions by the Department and the FBI in advance of the 2016 election, including allegations that McCabe should have been recused from participating in certain investigative matters.

On October 26, 2016, McCabe and NY-ADIC participated in what McCabe described as "a hastily convened conference call with the Attorney General who delivered the same message to us" about leaks, with specific focus being on leaks regarding the high-profile investigation by FBI's New York Field Office into the death of Eric Garner. McCabe told us that he "never heard her use more forceful language." NY-ADIC confirmed that the participants got "ripped by the AG on leaks."

According to NY-ADIC's testimony and an e-mail he sent to himself on October 31, McCabe indicated to NY-ADIC and a then-FBI Executive Assistant Director ("EAD") in a conversation after Attorney General Lynch disconnected from the call that McCabe was recusing himself from the CF Investigation. According to NY-ADIC's e-mail, McCabe told them "he may make a more formal decision at a later time." NY-ADIC stated during his OIG interview: "I think [McCabe] couched it as like, hey, this is not final . . . I don't know, I think he says he still has to talk about it." NY-ADIC stated that he clarified with McCabe that unless McCabe told him otherwise, NY-ADIC would begin reporting to EAD on the CF Investigation.

McCabe, however, told the OIG that he did not recall such a conversation. He said, "I suppose it's possible that I may have referred to the concept if that was being discussed generally at the time. But I would not have said to [NY-ADIC], like, I'm thinking about recusing."

5.    **McCabe Is Excluded from a Meeting Regarding Clinton E-mails Found on the Weiner Laptop (October 27)**

On October 27, 2016 at 10:00 a.m., Comey held a meeting with the Clinton E-mail Investigation team to discuss obtaining a search warrant for a set of Clinton-related e-mails the FBI had discovered on a laptop belonging to Anthony Weiner, and taking additional steps in the Clinton E-mail Investigation. Special Counsel attended the meeting. McCabe was out of town, but joined the meeting via conference call. Shortly after the meeting began, the then-FBI General Counsel ("FBI-GC") suggested, and Comey agreed, that McCabe should leave the call. Comey told us that he asked McCabe to drop off the call, and McCabe was "very unhappy about it." Special Counsel also left the meeting. After discussions between FBI and Department leadership, on October 28, 2016, Comey sent a letter, over Department objections, informing Congress that the FBI was taking additional steps in the Clinton E-mail Investigation.

Accounts differ about the reason for excluding McCabe from the October 27 call. McCabe told the OIG that the reason stated on the call for dropping him related to the potential for discussion about classified information. However, Comey, ████, and and Special Counsel all told us that Comey asked McCabe to leave the call out of an abundance of caution because of appearance issues following revelations in the WSJ October 23 article about the campaign donations from McAuliffe-associated PACs to McCabe's wife. McCabe discussed the issue of his participation in the Clinton e-mail matter further with Comey and FBI-GC by telephone later that day. After these conversations, McCabe sent a text message to

Special Counsel stating: "I spoke to both. Both understand that no decision on recusal will be made until I return and weigh in."

On November 1, 2016, McCabe sent e-mails to FBI executives and officials overseeing the CF Investigation and the Clinton E-mail Investigation informing them that he was recusing himself from those investigations.

### 6.   McCabe Authorizes Special Counsel and AD/OPA To Talk to Barrett Regarding CF Investigation and To Disclose August 12 McCabe-PADAG Call

#### a.   McCabe's Authorization

By October 25, 2016, McCabe had been notified that Barrett was working on a follow-up story to the October 23 article that would cover McCabe's oversight of the CF Investigation and potential connections with McAuliffe campaign contributions to McCabe's wife. McCabe thereafter authorized Special Counsel and AD/OPA to talk to Barrett about this follow-up story. Special Counsel told us that the authorization from McCabe was done orally and it was "pretty general." Special Counsel further stated that she understood from AD/OPA that the first call with Barrett would be "receive mode" to understand what Barrett's story would cover and then they would develop a response.

#### b.   Calls with Barrett and Special Counsel's Communications with McCabe (October 27 and 28)

At approximately 12:06 p.m. on October 27, 2016, shortly before Special Counsel was to speak with Barrett for the first time, McCabe texted Special Counsel asking "Are you in with wsj now".[3] About 10 minutes later, at 12:19 p.m., Special Counsel texted McCabe back stating that she was "going there now" and would call him "immediately after re call with devlin." Special Counsel told the OIG that she and AD/OPA then had their first call with Barrett in "receive mode" regarding his follow-up story. According to Special Counsel's contemporaneous notes of the call and testimony to the OIG, she and AD/OPA learned during the first call that Barrett had sources who were adamant that McCabe gave a purported order to "stand down" on the CF Investigation before the 2016 presidential election, implying that McCabe wanted to shut down the investigation for improper reasons.

Special Counsel texted McCabe at 1:25 p.m. and stated "Can you talk now?" After some additional texts between them to arrange the call, telephone records reflect that McCabe and Special Counsel spoke by telephone at 2:54 p.m. for 51 minutes. According to Special Counsel, she briefed McCabe on the conversation with Barrett and the purported "stand down" order. Special Counsel told the OIG that McCabe responded by reminding her that the August 12 PADAG call was completely inconsistent with that allegation. Special Counsel told us that she understood McCabe wanted her to provide the account of this August 12 call as

---

[3] By this time, McCabe had already left for ████████ and he remained out of town from October 27 through 30, 2016.

rebuttal to that "stand down" allegation and made a large notation of "Fri. Aug. 12 with [PADAG]" at the top of her notes to remind herself to discuss it in the next call with Barrett.

When interviewed by the OIG on November 29, 2017, McCabe's recollection of his call with Special Counsel was consistent with hers.  Specifically, McCabe stated that he authorized Special Counsel and AD/OPA to provide to Barrett the account of his August 12 call with PADAG because McCabe thought it was the "best example" to counter the "incredibly damaging" narrative in Barrett's intended story. McCabe said that he did not view the disclosure to the WSJ about the August 12 PADAG call as disclosing the existence of the CF Investigation because the purpose was to demonstrate the FBI's independence, and "there really wasn't any discussion of the case, of the merits of the case, the targets and subjects of the case."

McCabe stated that this was the only time in his career where he had authorized the disclosure to the media of a one-on-one discussion that he had with a member of the Department's leadership.

FBI text message and phone records show that, immediately before Special Counsel and AD/OPA spoke for the second time with Barrett, McCabe called Special Counsel at 4:38 p.m. and the two spoke for 6 minutes.  E-mail and text message records show that, approximately 1 minute after the call between McCabe and Special Counsel ended, Special Counsel and AD/OPA began their second call with Barrett, which lasted from approximately 4:45 p.m. to 5:21 p.m.  According to Special Counsel's contemporaneous notes and testimony to the OIG, in this follow-up call with Barrett she responded to the claims regarding FBI leadership's handling of the CF Investigation and provided the account of the August 12 McCabe-PADAG call as the "best evidence" to counter Barrett's narrative.

Two minutes after the call ended, Special Counsel texted McCabe at 5:23 p.m. stating:  "We're done.  He's going to look at his story again and will circle back with him in the morning."  According to telephone records, McCabe thereafter called Special Counsel twice, once at 6:47 p.m., when they spoke for about 5 minutes, and again at 7:06 p.m., when they spoke for about 6 minutes.

During the early afternoon of October 28, 2016, Special Counsel and AD/OPA had an additional call with Barrett that lasted at least 15 minutes.  According to Special Counsel's contemporaneous notes and testimony to the OIG, Barrett provided them a preview of the revised story, which now incorporated aspects of the McCabe-PADAG call on August 12 to rebut the "stand-down" allegation.

After this call ended, Special Counsel texted McCabe at 1:33 p.m. stating: "Just got off with barrett.  Give me a call here."  According to telephone records, at 1:38 p.m., McCabe and Special Counsel spoke for 23 minutes.

### 7.    The October 30 WSJ Article

On October 30, 2016, prior to the article's online publication, Special Counsel exchanged text messages with a then-FBI Deputy Assistant Director ("DAD")

regarding the forthcoming article.  DAD forwarded to Special Counsel a Washington Post article from the day before (October 29), entitled "Justice Officials Warned FBI that Comey's Decision to Update Congress Was Not Consistent With Department Policy."  The article stated that Department officials told Comey that his decision to update Congress about the discovery of additional Clinton e-mails prior to the election was inconsistent with Department policy, and DAD observed in his text message that "This is all [PADAG]."  Special Counsel responded "Yeah.  I saw it. Makes me feel WAY less bad about throwing him under the bus in the forthcoming CF article."  Special Counsel told us that she was referring in this text to her disclosure to Barrett about the August 12 conversation between McCabe and PADAG, and what she meant by "throwing [PADAG] under the bus" was that it was an "unfortunate sort of fact or consequence" but it was "necessary to rebut the notion that [Andy] was trying to kill the Clinton Foundation case for inappropriate or improper reasons."

Barrett's follow-up article was published online on Sunday, October 30, 2016, at about 3:34 p.m., and appeared in the WSJ print edition the next day under the title "FBI, Justice Feud in Clinton Probe."  The article described how Comey's disclosure that FBI agents were taking another look at the Clinton e-mails "lays bare, just days before the election, tensions inside the bureau and the Justice Department over how to investigate the Democratic presidential nominee."  The article discussed not only the FBI's handling of the Clinton E-mail Investigation, but "internal disagreements within the bureau and the Justice Department surrounding the Clintons' family philanthropy."  It stated that "McCabe in particular was caught . . . [in] an increasingly acrimonious fight for control between the Justice Department and FBI agents pursuing the Clinton Foundation case."  Thereafter, the article highlighted the campaign donations to McCabe's wife by PACs associated with McAuliffe, who was described as "a longtime ally of the Clintons and . . . a Clinton Foundation Board member."  The article identified McCabe as the FBI official who "sought to refocus the Clinton Foundation probe," and reported that agents "further down the FBI chain of command" had been told to "[s]tand down" on the Clinton Foundation investigation with the understanding that "the order had come from the deputy director — Mr. McCabe."  The article stated that "[o]thers familiar with the matter deny Mr. McCabe or any other senior FBI official gave such a stand-down instruction."  The article recounted the August 12 conversation between McCabe and PADAG (identified as an unnamed "senior Justice Department Official").  It stated:

> According to a person familiar with the probes, on Aug. 12, a senior Justice Department official called Mr. McCabe to voice his displeasure at finding that New York FBI agents were still openly pursuing the Clinton Foundation probe during the election season.  Mr. McCabe said agents still had the authority to pursue the issue as long as they didn't use overt methods requiring Justice Department approvals.

> The Justice Department official was "very pissed off," according to one person close to McCabe, and pressed him to explain why the FBI was still chasing a matter the department considered dormant. . . .

"Are you telling me that I need to shut down a validly predicated investigation?" Mr. McCabe asked, according to people familiar with the conversation.  After a pause, the official replied "Of course not," these people said.[4]

### 8.   McCabe Admonishes Two FBI Executives for Leaks in the October 30 WSJ Article Regarding the CF Investigation

Two FBI Executives, NY-ADIC and the then-Assistant Director in Charge of the Washington Field Division ("W-ADIC"), told us that they each received calls from McCabe admonishing them for leaks contained in the October 30 WSJ article about the CF Investigation.  At no time did McCabe disclose to either of them that McCabe had authorized Special Counsel to disclose information about the CF Investigation to the WSJ reporter.

According to NY-ADIC's contemporaneous October 30 calendar notes and testimony to the OIG, McCabe called NY-ADIC on Sunday, October 30, at 5:11 p.m., to express concerns over leaks from the FBI's New York Field Office in the October 30 WSJ article.  NY-ADIC told the OIG that McCabe was "ticked about leaks" in the article on the CF Investigation, but NY-ADIC "pushed back" a little to note that New York agents were not privy to some of the information in the article. Also according to NY-ADIC's calendar notes, as well as his testimony to the OIG, NY-ADIC spoke to EAD and other FBI managers after his call with McCabe to voice concerns "about getting yelled at about this stuff" when he was supposed to be dealing with EAD on Clinton Foundation issues because of his understanding that McCabe had recused himself from the matter.

W-ADIC told the OIG that he received a call from McCabe regarding the October 30 WSJ article and that McCabe admonished him regarding leaks in the article.  According to W-ADIC, McCabe told him to "get his house in order."

McCabe told us that he did not recall calling either NY-ADIC or W-ADIC to reprimand them for leaks in the October 30 WSJ article.

### 9.   Comey Expresses Concern About Leaks at his Staff Meeting and Discusses the October 30 WSJ Article with McCabe (October 31)

On Monday morning, October 31, 2016, Comey held a staff meeting, which Special Counsel attended.  According to Special Counsel's contemporaneous notes, during the meeting Comey said "Need to figure out how to get our folks to understand why leaks hurt our organization."  That same day McCabe and Comey had a face-to-face conversation about the October 30 WSJ article.  The accounts they provided to the OIG of this discussion contradicted one another.

---

[4]  Both McCabe and PADAG told the OIG that the account of the August 12, 2016 telephone call given in the October 30, 2016 WSJ article was an accurate description of their discussion. However, PADAG told the OIG that he thought that "the Bureau was trying to spin this conversation as some evidence of political interference, which was totally unfair."

### a.    McCabe's Account

According to McCabe's testimony to the OIG on November 29, 2017, he and Comey discussed the October 30 WSJ article in person on October 31, 2016, when McCabe returned to the office from a trip ████████████. McCabe said that he told Comey that he had "authorized AD/OPA and Special Counsel to disclose the account of the August 12th call" and did not say anything to suggest in any way that it was unauthorized. McCabe told us that Comey "did not react negatively, just kind of accepted it." McCabe also told us Comey thought it was a "good" idea that they presented this information to rebut the inaccurate and one-sided narrative that the FBI was not doing its job and was subject to DOJ political pressure, but the Department and PADAG were likely to be angry that "this information made its way into the paper."

McCabe told us that he did not recall telling Comey prior to publication of the October 30 article that he intended to authorize or had authorized Special Counsel and AD/OPA to recount his August 12 call with PADAG to the WSJ, although he said it was possible he did. When asked why he did not discuss it with the Director in advance, McCabe said the Director was "very, very occupied" at the time with the Weiner laptop issue. McCabe told us that if he had not been out of town, he would have talked to Comey about the disclosure in advance because it involved a significant issue. When questioned by the OIG as to whether, as Deputy Director, he had the capability to reach Comey wherever he was and whenever he needed, McCabe acknowledged that he did but added it was challenging to do so between October 27 and 28, given the Weiner laptop issue and the fact that Comey told him he did not want to discuss that issue with him.

### b.    Comey's Account

We questioned Comey specifically about the portion of the October 30 WSJ article that pertained to the PADAG call. Comey told us that he recalled seeing this article but did not know how the disclosure about the PADAG call in the October 30 article happened. He said that he was "very concerned" about that part of the article because he felt it would further poison the FBI's relationship with Department and it "explicitly confirms the existence of a criminal investigation" of the Clinton Foundation. Comey told us he considered the disclosure about the PADAG call "problematic" because it related to "sensitive FBI information" and was unauthorized, unless either he or McCabe authorized it and Comey knew that he did not authorize it.

Comey told us that, prior to the article's publication, he did not have any discussions with McCabe regarding disclosure of the August 12 PADAG call. According to Comey, he discussed the issue with McCabe after the article was published, and at that time McCabe "definitely did not tell me that he authorized" the disclosure of the PADAG call. Comey said that McCabe gave him the exact opposite impression:

> I don't remember exactly how, but I remember some form or fashion and it could have been like "can you believe this crap? How does this

stuff get out" kind of thing?  But I took from whatever communication we had that he wasn't involved in it.

 . . .

I have a strong impression he conveyed to me "it wasn't me boss." And I don't think that was by saying those words, I think it was most likely by saying "I don't know how this shit gets in the media or why would people talk about this kind of thing," words that I would fairly take as "I, Andy, didn't do it."  And I actually didn't suspect Andy, after conversations with [my chief of staff], my worry was, was his aide [Special Counsel] doing it.

When asked by the OIG about whether he would have approved the disclosure about the PADAG call to the WSJ, Comey stated:   "[S]o just to make sure there's no fuzz on it, I did not authorize this.  I would not have authorized this. If someone says that I did, then we ought to have another conversation because I, it doesn't make a lot of sense to me."

Comey said he believed that McCabe would have known from experience to discuss any disclosures regarding pending FBI investigations with Comey before releasing such information to the media.  Comey told us that McCabe would have known that the disclosure of the existence of a specific investigation was a significant event "that he should discuss with me first" given Comey's responsibility as FBI Director for how the FBI interacts with the world.  Comey told us that the disclosure of the existence of a specific investigation would require much internal discussion on the form and wording, and would not be done through "anonymous[] source[s] in a newspaper."  Comey further told us that he would not have authorized the disclosure of the account of the McCabe-PADAG August 12 call, even if an argument had been made that it was in the best interest of the FBI.  Comey said that such an argument would not have been persuasive for him in light of the following circumstances:  (1) the disclosure involved publicly confirming the existence of the CF Investigation, which Comey had declined to do 3 months earlier during testimony before Congress; (2) the disclosure risked harming FBI-Department relations; and (3) the disclosure occurred 2 days after the firestorm surrounding the October 28 letter to Congress re-opening the Clinton E-mail Investigation.

### 10.    Knowledge of Other FBI Executives

McCabe told us that among FBI executive managers "people knew that generally" he had authorized the disclosure to the Wall Street Journal, "because it was my conversation" and "the fact that [AD/OPA] and [Special Counsel] were engaging with Devlin Barrett over the article was not a secret."  McCabe identified several FBI managers who he believed likely or possibly would have known, based on his interactions with them, that he authorized Special Counsel and AD/OPA to talk to the WSJ and disclose the account of his August 12 call with PADAG.

However, none of the potential witnesses identified by McCabe (FBI-GC, Comey's Chief of Staff, The Counterintelligence Assistant Director ("AD-CI"), and

McCabe's then-Chief of Staff ) corroborated this or recalled knowing at the time, or even now, that McCabe had authorized the disclosure.[5] FBI-GC told us that, had McCabe discussed the matter with him, he would have counseled McCabe to avoid anything related to the CF Investigation, including authorizing disclosures to the press, given FBI-GC's and Comey's pending concerns about McCabe's potential appearance issues on Clinton-related matters. Comey's Chief of Staff, AD-CI, and McCabe's Chief of Staff told us that had they heard about such an authorization they would have remembered it because it would have been significant and spurred conversation among other senior executive managers. These witnesses also told us that because the disclosure detailed a private conversation between two high-ranking officials at the FBI and the Department on a high-profile investigation, they did not believe that it was an authorized disclosure. McCabe's Chief of Staff told us that:

> I just can't imagine that the Deputy would have authorized the leak. It just doesn't seem to serve, I mean, I guess it serves, it serves the purpose of the Deputy by saying, hey look, do you want us to shut this thing down? I guess it serves Andy in that way, but it really, it really highlights a dysfunction between the FBI and the, and DOJ. And to that end, it doesn't really serve the greater good.

### 11. McCabe Admonishes NY-ADIC for CF Investigation Leaks Following November 3 WSJ Article (November 4)

On November 3, 2016, the WSJ published another story by Barrett on the CF Investigation and it repeated parts of the account of the McCabe-PADAG call. That evening, McCabe e-mailed NY-ADIC and stated: "This is the latest WSJ article. Call me tomorrow." According to NY-ADIC's calendar notes on November 4 and testimony to the OIG, NY-ADIC and McCabe spoke for approximately 10 minutes around 7 a.m., regarding "leaks and WSJ article" and that McCabe was "angry." NY-ADIC's calendar notes also reflect that McCabe expressed to him: "will be consequence[s] and get to bottom of it post elect[ion]. Need leaks to stop. Damaging to org."

McCabe told the OIG that he did not recall the details of his conversation with NY-ADIC on November 4, but it was "probably about leaks" to the media.

### 12. INSD Opens an Investigation of the WSJ Leak (May 2017)

In May 2017, the FBI Inspection Division (INSD) expanded a pre-existing investigation of media leaks to include determining the source of the information in the October 30 WSJ article regarding the August 12 McCabe-PADAG call. INSD added the October 30 article to their pre-existing matter because it appeared to

---

[5] FBI-GC told us that McCabe had told him recently in discussions on attending OIG interviews that the OIG was looking at the October 30 article and that he, McCabe, had authorized the disclosure of some unspecified information that appeared in that article.

involve an instance of someone at the FBI leaking the Deputy Director's private conversations to the media.

### 13.    INSD Interviews McCabe under Oath on May 9

INSD interviewed McCabe under oath regarding the October 30 WSJ article on May 9, 2017.[6]  The INSD investigators documented the May 9 interview in contemporaneous notes and in a draft Signed Sworn Statement prepared shortly after the interview, and later provided testimony to the OIG regarding their recollections of McCabe's testimony.  In his interview with the OIG on November 29, 2017, McCabe provided a starkly different account of what he believes he said and what occurred during this interview.  Because these conflicting accounts are central to the issues addressed in this report, we address the INSD accounts and McCabe's account in detail in separate subsections below.

#### a.    INSD Written Record of the Interview and Testimony by Interviewing Agents

Two INSD agents, a Supervisory Special Agent ("INSD-SSA1"), and the then-Chief of the INSD Internal Investigations Section ("INSD Section Chief"), interviewed McCabe under oath in his office on the afternoon of May 9 concerning the leak matters they were investigating.[7]  During the interview, after discussing with McCabe an unrelated media leak allegation, the INSD agents provided McCabe with a copy of the October 30 article to review, and which McCabe initialed.  According to INSD SSA 1's contemporaneous notes and both agents' testimony to the OIG, INSD drew McCabe's attention specifically to the portion of the October 30 WSJ article regarding McCabe's August 12 call with the PADAG.

INSD-Section Chief told us that the entire interview, including the discussion on the October 30 article, was conducted in the privacy of McCabe's personal office with just McCabe, ██████ and INSD-SSA1 in attendance, while they were sitting at a table in McCabe's office, where McCabe initialed the copy of the WSJ article.  INSD-Section Chief told us that all of the INSD interviews with McCabe were conducted in the privacy of his office at his table "from beginning to end."  INSD-Section Chief said that INSD's standard practice is to conduct an interview in a private setting solely with INSD agents and the particular witness involved in the matter.

INSD-SSA1 took two and half pages of contemporaneous notes during the interview, almost all of which concerned the October 30 article and the August 12 call between McCabe and PADAG.  According to INSD-SSA1's notes and testimony to the OIG, McCabe was given an opportunity to review the article and he then told

---

[6]  Later in the day, after the interview, President Trump fired FBI Director Comey, and McCabe became Acting FBI Director, a position he remained in until Director Wray's confirmation on August 1, 2017.

[7]  INSD-Section Chief has since been promoted ███████████████████████ ████████████████████████████████

the agents that he remembered the article and said that the account in the article of his August 12 call with PADAG was accurate.  Also according to INSD-SSA1's contemporaneous notes and testimony to the OIG, McCabe told them that he had "no idea where it came from," that was "who the source was" who disclosed the account of his August 12 call with PADAG to the WSJ.  INSD-SSA1 further told the OIG that McCabe stated during the interview that he had related the account of the August 12 call to others numerous times, leaving INSD-SSA1 with the impression that INSD-SSA1 would "not get anywhere by asking" McCabe how many people could have known about what appeared to be a private conversation between him and PADAG.  INSD-SSA1 told us that he didn't need to take many notes during the interview because, at that point, he viewed McCabe as "the victim" of the leak and McCabe had told the INSD agents that he did not know how this happened.  INSD-SSA1 also told us that the whole interaction was short, maybe 5 to 7 minutes, and flowing because McCabe was seemingly the victim and claimed he did not know who did it.  INSD-SSA1 said that McCabe's information could be summarized in one paragraph in his draft statement.

Similarly, INSD-Section Chief told us that the "overarching" take-aways from their interview with McCabe were that McCabe did not grant anyone permission to divulge the account of his August 12 call with PADAG to the media, he had not personally shared that information with the media, and he considered it a leak.  INSD-Section Chief also told us that McCabe acknowledged that he had expressed the sentiment reflected in the quote "are you telling me that I need to shut down a validly predicated investigation," to PADAG, and was disappointed that it had appeared in the article.  INSD-Section Chief further told us that their discussion with McCabe about the October 30 article was not rushed and that none of their discussions with McCabe on media leaks ended abruptly.

### b.  INSD Prepares a Draft Statement for McCabe To Sign, Which McCabe Fails To Do (May 12 and June 23)

Three days later, on May 12, 2017, INSD e-mailed McCabe a draft Signed Sworn Statement (SSS) for his review and signature that initially concerned an unrelated leak matter but that had been revised to include his comments on the May 9 interview about the October 30 WSJ article.  The e-mail highlighted that a new paragraph had been added, starting on page 10, regarding statements made by McCabe about the October 30 article.  This paragraph stated:

> On 05/09/2017, [INSD-Section Chief] and [INSD-SSA1] provided me with a photocopy of a Wall Street Journal article, dated 10/30/2016, and requested I evaluate and assess the content of the first three paragraphs appearing on the last page for accuracy.  My assessment of the referenced portion of the article is that it is basically an accurate depiction of an actual telephonic interaction I had with a Department of Justice (DOJ) executive.  I do not know the identity of the source of the information contained in the article.  Since this event, I have shared the circumstances of this interaction with numerous FBI senior executives and other FBI personnel.  I gave no one authority to share

any information relative to my interaction with the DOJ executive with any member of the media.  I initialed a photocopy of the article, which is attached to my statement as Exhibit Number 5.

This draft SSS paragraph is consistent with INSD's contemporaneous notes of the May 9 interview and the sworn recollections of both INSD agents who interviewed McCabe, as they described to the OIG.

As of approximately 1 month later, McCabe had failed to execute and return the draft SSS.  Accordingly, on June 23, INSD again e-mailed it to him and again requested that he review and sign it.  However, INSD accidentally sent it to a different FBI employee rather than to then-Acting Director Andrew G. McCabe.  The unintended recipient forwarded the INSD e-mail to then-Acting Director McCabe.  That same date, McCabe e-mailed INSD to note the error in the address.  McCabe did not sign the draft SSS and did not communicate with INSD regarding the draft SSS until August 18, as described below.

### c. McCabe's November 29, 2017 Account of the May 9 INSD Interview and His Response to Draft Statement

During his OIG interview on November 29, 2017, McCabe provided a very different account of his interactions with INSD on May 9.  Specifically, McCabe told the OIG that the INSD agents "must have" gotten it wrong when they wrote in the draft SSS that he told them on May 9 that he did not authorize the conversation and that he did not know who the source was.  McCabe said that he did not believe he told INSD that he did not authorize the disclosure, but added "I don't remember what I said to them."  He added "I don't remember discussing authorization of that article" with INSD and that "the INSD folks and I walked away from that, from that exchange with a difference in understanding."  However, he acknowledged to the OIG that his initials appeared on the copy of the WSJ article that INSD presented to him for review during the interview.  McCabe told the OIG that he did not know and could not explain how INSD got the impression that he thought it was an unauthorized leak because he said he does not believe he told INSD that.

McCabe also asserted that the May 9 meeting concerned an unrelated leak matter and that the discussion about the October 30 article occurred near the end of the meeting when "one of the people on that team pulled me aside and asked me a question about the Wall Street Journal article."  He elaborated by stating that as the INSD agents were "walking out of my office into the hallway, and [INSD-Section Chief] kind of grabbed me by the arm and said, hey, let me ask you about something else."  McCabe said that he and INSD-Section Chief were still in his office, he thought standing, during the conversation but that the other two INSD agents (McCabe recalled there being three INSD agents present that day, not two) were outside his office.  He said INSD-Section Chief showed him the October 30 WSJ article at that time and asked him "a question or two about it.  And that was it. It was a very quick exchange."  McCabe said he was confused as to why this article was even being raised because it did not relate to a different media leak matter that McCabe asserted was the main focus of their meeting on May 9.

McCabe told the OIG that he did not remember when he first reviewed the revised draft SSS addressing the October 30 WSJ article, but that "it could have been months later" after he received it.  He said: "I don't remember reviewing the statement while I was Acting Director.  It's possible, but I don't remember when I actually, I think it's possible I just put the entire thing aside and said I'll deal with that some other time.  The other time ended up being when I was back as Deputy Director."  McCabe returned to his position as Deputy Director after Director Wray was confirmed, on August 1, 2017.

### 14.  McCabe's Initial Account under Oath to the OIG on July 28, 2017

On Friday, July 28, 2017, the OIG interviewed McCabe under oath in connection with its ongoing review of various FBI and Department actions in advance of the 2016 Election.  The primary focus of the interview was to determine McCabe's awareness of the existence of certain text messages between Special Counsel and DAD that the OIG had recently discovered.  During the course of the interview, the OIG showed McCabe text messages dated October 27, 28, and 30 from Special Counsel to DAD, indicating that Special Counsel had been in contact with WSJ reporter Barrett and appeared to have been a source for the October 30 WSJ article.  At the time of the interview, the OIG was not aware of INSD's May 9 interview of McCabe.

The OIG showed McCabe a text exchange on October 30 in which DAD forwarded an article from the Washington Post to Special Counsel, entitled "Justice officials warned FBI that Comey's decision to update Congress was not consistent with department policy."  DAD texted "This is all [PADAG]."  Special Counsel responded "Yeah I saw it.  Makes me feel WAY less bad about throwing him under the bus in the forthcoming CF article."  These texts suggested that Special Counsel may have provided the information to Barrett concerning McCabe's August 12 call that eventually appeared in the October 30 WSJ article.  After the OIG showed these text messages to McCabe, the following exchange took place:

> OIG:  . . . Which we're not sure what [CF] relates to, perhaps Clinton Foundation.  Do you happen to know?
>
> MR. MCCABE:  I don't know what she's referring to.
>
> OIG:  Or perhaps a code name?
>
> MR. MCCABE:  Not one that I recall, but this thing is like right in the middle of the allegations about me, and so I don't really want to get into discussing this article with you.
>
> OIG:  Okay.
>
> MR. MCCABE:  Because it just seems like we're kind of crossing the strings a little bit there.
>
> OIG:  Was she ever authorized to speak to reporters in this time period, was [Special Counsel]?
>
> MR. MCCABE:  Not that I'm aware of.

Later in the interview, the OIG directed McCabe's attention to other texts from October 27 and 28 indicating that Special Counsel was talking to Barrett. McCabe stated "I was not even in town during those days.  So I can't tell you where she was or what she was doing."

### 15.   McCabe Calls the OIG on August 1 To Correct his Testimony

On Tuesday, August 1, 2017, McCabe placed a telephone call to an OIG Assistant Inspector General ("AIG") to correct the statement he gave on July 28. In an e-mail prepared the same day, AIG summarized the call, in relevant part, as follows:

> McCabe stated that he believes that [Special Counsel] may have been authorized by him to work with [AD/OPA] and to speak with the WSJ for the late October article.  He said he had worked with [Special Counsel] on a previous WSJ article earlier in the month when they spent the day trying to correct inaccuracies.  At the time the second article was being prepared, McCabe was out of town ███████████ ████  He believes he may have authorized [Special Counsel] to work with [AD/OPA] and speak to Devlin Barrett (the WSJ reporter) because she had previously worked with McCabe on the issues raised by his wife's political campaign and was very familiar with those issues . . . . He said [AD/OPA] would be familiar with Special Counsel's role and authority to speak.

The OIG questioned McCabe about his August 1 call during his OIG interview, on November 29.  McCabe told the OIG that he called AIG on August 1 after spending "a lot of time thinking about it" over the weekend, and that "on further recollection, yeah, I remember authorizing [Special Counsel] and [AD/OPA] to talk to the Wall Street Journal."  He said "it was important to me that [AIG] and you all did not have the misimpression about the authorization that I had given to, to [AD/OPA] and [Special Counsel] to interact with Devlin Barrett on that article."  He further stated that it was important to him that the OIG not "start heading off in a direction on [AD/OPA] and [Special Counsel] that's not, that would not have been accurate."

When the OIG pointed out that McCabe's statement on July 28 that he didn't know where Special Counsel was or what she was doing on October 27 or 28 was inaccurate, he stated:

> Yeah, and as I've said before, and she made clear, I, I was very concerned, as I think I said at that time, uncomfortable about discussing things that I thought were outside the scope that [AIG] had identified for me that day . . . .  And I felt like that's the direction that the questions were coming from.  I didn't feel comfortable saying, you know, vouching for what was in [DAD] and [Special Counsel]'s texts and saying what they meant.  I had not thought about the Wall Street Journal article and the conversations we had around it in quite a long time.  And so, I misspoke.

McCabe denied that being shown the text messages on July 28 that indicated Special Counsel had spoken to Barrett caused him to change his account in order to protect Special Counsel.  McCabe told the OIG that this "thinking process" was done "on my own" without talking to any FBI employees or reviewing past e-mails or text messages.  He stated that he did not discuss the Devlin texts with Special Counsel after the July 28 interview.  While Special Counsel told the OIG that following McCabe's July 28 OIG interview, she and McCabe discussed her text messages, she said that McCabe did not discuss his OIG testimony about the WSJ article, or the WSJ article itself, at that time.  Special Counsel stated that she and McCabe did not discuss "getting their stories straight" with respect to the WSJ article.  Special Counsel told the OIG that the last time she spoke with McCabe about the WSJ article was in approximately October 2016 (when the article was published).

### 16.   INSD and the OIG Interview Special Counsel under Oath Regarding the October 30 Article (August 7, September 7, October 26)

On August 7, 2017, INSD interviewed Special Counsel concerning the October 30 article.  At that time, INSD investigators were not aware of Special Counsel's texts on October 27, 28, and 30 concerning her contacts with Barrett and they had not made progress uncovering who may have been the source of the account of the August 12 McCabe-PADAG call provided to the WSJ.  During the interview, Special Counsel told INSD agents under oath that she was a source for the disclosure of the account of the August 12 McCabe-PADAG call, the disclosure was fully authorized by McCabe, and Special Counsel and AD/OPA provided the information to Barrett in a telephone call from the FBI OPA office.  Special Counsel signed an SSS to this effect on August 15, 2017, which included as an exhibit her contemporaneous notes of the discussions with Barrett on October 27 and 28, 2016.  Special Counsel gave the same account to the OIG in two subsequent interviews on September 7 and October 26, 2017.

### 17.   INSD Interviews McCabe Again (August 18)

On August 18, 2017, INSD-SSA1 and a second SSA ("INSD-SSA2") re-interviewed McCabe after being told by Special Counsel that it was McCabe who had authorized the conversation with Barrett in advance of the October 30 WSJ article.

In light of Special Counsel's testimony, INSD-SSA1 told us that, during the re-interview, he affirmatively showed McCabe the WSJ article again and asked him again if he authorized the disclosure regarding the PADAG call because INSD had received conflicting information.  INSD-SSA1 said McCabe "looked at it, and he read it.  And as nice as could be, he said yep.  Yep, I did," although he said he did not recall specifically doing it.  INSD-SSA1 stated that McCabe said he did not recall authorizing the description of the PADAG call, but that McCabe "took responsibility, or he took ownership of it," and that he was "okay with it."  According to INSD-SSA1's testimony:

> I remember saying to him, at, I said, sir, you understand that we put a lot of work into this based on what you've told us.  I mean, and I even

said, long nights and weekends working on this, trying to find out who amongst your ranks of trusted people would, would do something like that.  And he kind of just looked down, kind of nodded, and said, yeah, I'm sorry.

INSD-SSA1's contemporaneous notes also reflected that he said to McCabe that INSD would have "taken a different approach" if McCabe "had told me and [INSD-Section Chief] that he authorized the article in WSJ."  McCabe responded, according to INSD-SSA1's notes, "'I know' but there was a lot going on at the time."

According to INSD-SSA2, and consistent with ███ contemporaneous notes, McCabe stated that he did authorize Special Counsel and AD/OPA to speak "on background" to Barrett for the article.  INSD-SSA2 said that McCabe told them that he did not specifically recall authorizing the disclosure of the PADAG call to the WSJ, but assumes he did.

McCabe told us that he convened the August 18 meeting with INSD "for the purpose of telling them that I would not sign the signed sworn statement" because, among other things, it inaccurately reflected that he had not authorized the disclosure to the WSJ.  McCabe told us that the August 18 meeting was the first time he told INSD that the signed sworn statement was inaccurate.

### 18. The OIG Assumes Responsibility for the Investigation (August 31)

Following the INSD interviews of Special Counsel and McCabe in August 2017, INSD officials became concerned that there was a significant question of whether Deputy Director McCabe had testified truthfully to INSD on May 9.  INSD-Section Chief told us that she recommended turning the matter over to the OIG because it was no longer appropriate for GS-14 agents in the Internal Investigations Section to continue the investigation of their Deputy Director, and that INSD "needed to turn this over to an independent authority to review and investigate."  The Assistant Director for INSD agreed, and referred the matter to the OIG.  The OIG formally accepted the referral on August 31, 2017.

### 19. The OIG Interviews McCabe under Oath on November 29

On November 29, 2017, the OIG interviewed McCabe under oath again, this time addressing the WSJ leak issue in detail.  McCabe was represented by counsel during the interview, and, consistent with OIG practice, the interview was audio recorded.  Among other things, and as detailed in prior sections, McCabe told the OIG:

- that he authorized Special Counsel and AD/OPA to disclose his August 12, 2016 conversation with PADAG to the WSJ and he had frequent contact and communication with Special Counsel about the WSJ article, before it was published, while he was out of town on October 27 and 28;

- that he did not recall discussing the disclosure with Comey in advance of authorizing it, although it was possible that he did;

- that after publication of the October 30 WSJ article he told Comey that he (McCabe) had authorized the disclosure, and that Comey "did not react negatively, just kind of accepted it" and thought it was "good" that they presented this information to rebut the inaccurate and one-sided narrative that the FBI was not doing its job;

- that other FBI executive managers knew generally that he had authorized the disclosure;

- that, notwithstanding the accounts of the INSD agents, contemporary notes, or the draft SSS, he did not tell INSD on May 9 that he had not authorized the disclosure to the WSJ about the PADAG call;

- that at the end of the May 9 meeting with the INSD agents on an unrelated leak matter he was pulled aside by INSD-Section Chief alone and asked a question or two about the October 30 WSJ article;

- that, despite being asked to sign the SSS on multiple occasions, he probably did not review the language in the draft SSS until after Director Wray was confirmed (which was on August 1, 2017);

- that the explanation for his inaccurate July 28 testimony to the OIG was that he was surprised to be asked about the WSJ matter during that interview;

- that between May 9 and August 18 he did not affirmatively tell INSD he had authorized the disclosure; and

- that he convened the August 18 meeting with INSD to tell them he would not sign the SSS because, among other things, the statement in it denying he had authorized the disclosure was not accurate.

## IV.   OIG Analysis

### A.   Lack of Candor

We concluded that McCabe lacked candor on four separate occasions in connection with the disclosure to the WSJ. Three of those occasions involved his testimony under oath.

#### 1.   Lack of Candor with Then-Director Comey on or around October 31, 2016

We concluded that McCabe lacked candor during his conversation with then-Director Comey on or about October 31, 2016, when they discussed the October 30 WSJ article. As detailed above, Comey and McCabe gave starkly conflicting accounts of this conversation. Comey said that McCabe "definitely" did not tell Comey that he had authorized the disclosure about the PADAG call. To the contrary, Comey told the OIG that, on or about October 31, McCabe led him to

believe "in form or fashion" that McCabe did not authorize the disclosure about the PADAG call to the WSJ.  Comey described how McCabe gave Comey the impression that McCabe had not authorized the disclosure about the PADAG call, was not involved in the disclosure, and did not know how it happened.  By contrast, McCabe asserted that he explicitly told Comey during that conversation that he authorized the disclosure and that Comey agreed it was a "good" idea.

While the only direct evidence regarding this McCabe-Comey conversation were the recollections of the two participants, there is considerable circumstantial evidence and we concluded that the overwhelming weight of that evidence supported Comey's version of the conversation.  Indeed, none of the circumstantial evidence provided support for McCabe's account of the discussion; rather, we found that much of the available evidence undercut McCabe's claim.[8]

First, Comey had pointedly refused to confirm the existence of the CF Investigation in testimony to Congress just 3 months earlier.  Additionally, 1 month before McCabe authorized the disclosure, Comey also refused to confirm or deny two different investigations during an FBI oversight hearing before the House Judiciary Committee.  Comey stated during the hearing:  "our standard is we do not confirm or deny the existence of investigations."  Comey noted that there is a public interest exception, but "our overwhelming rule is we do not comment except in certain exceptional circumstances."  Comey told us that when the FBI made disclosures of this type during his tenure, such as occurred in connection with the Clinton E-mail and Russia investigations, it did so only after careful deliberations as to form and wording; he also noted that such a disclosure would not be made through an anonymously sourced quote given to a single reporter.  We found it highly improbable that Comey would have been approving of a decision by McCabe to disclose to a reporter, on background, information essentially confirming the existence of an FBI investigation that Comey himself had refused to confirm when testifying before Congress.

Second, on the morning after the article appeared online (and the same day it appeared in print), Comey expressed concerns at his staff meeting about the volume of leaks, as evidenced by Special Counsel's contemporaneous notes of the meeting.  We found it highly unlikely that Comey, in a discussion with McCabe that same day, would have been accepting of a disclosure authorized by McCabe that looked exactly like the type of leak that he was condemning to his staff.

---

[8]  In comments submitted by his counsel in response to a draft of this report, McCabe stated "there is no indication that any of Director Comey's comments were referring to the PADAG call."  To the contrary, as detailed in this report and made clear in the draft that was made available for McCabe's and his counsel's review, the OIG questioned Comey with specific reference to the portion of the WSJ article that related to McCabe's call on August 12 with PADAG.  There is no ambiguity. Comey told us that, at the time, he was "very concerned" about the disclosure for a number of reasons, including the impact of this disclosure on FBI-DOJ relations.  And Comey told us that that McCabe led him to believe that McCabe had nothing to do with the disclosure, "most likely" by stating that McCabe didn't know where the disclosure came from, and "definitely" did not state to Comey that he, McCabe, authorized the disclosure.

Third, the disclosure occurred less than 10 days before the presidential election and just 2 days after the firestorm surrounding Comey's letter to Congress about taking additional steps in the Clinton E-mail Investigation.  Disclosure of the PADAG call risked subjecting the FBI to even more criticism about potentially affecting the imminent presidential election, by confirming the existence of a previously unconfirmed criminal investigation involving candidate Clinton.  We highly doubt that Comey, who himself expressed concern to us that the WSJ disclosure occurred 2 days after his October 28 letter, would have countenanced such a disclosure by McCabe within days of the election if he had been told about it.

Fourth, publishing the account of the PADAG call risked further "poisoning" the FBI's relationship with DOJ leadership at a time it was already under great strain because of, among other things, Comey's decision to notify Congress on October 28 that the FBI was taking additional steps in the Clinton E-mail Investigation and the Department leadership's concern about leaks emanating from the FBI.[9]

Fifth, on October 27, Comey and FBI-GC expressed concerns to McCabe about whether McCabe should participate further in the Clinton E-mail Investigation because of the appearance created by the campaign contributions to his wife's campaign.  The same logic applied to the CF Investigation.  On that same date, McCabe authorized Special Counsel to discuss the August 12 PADAG call with the WSJ reporter, thereby confirming the FBI's criminal investigation.  McCabe's text message to Special Counsel late on October 27 ("no decision on recusal will be made until I return and weigh in") shows that he knew the issue of recusal was clearly on the table; indeed, McCabe announced his recusal from both Clinton-related matters on November 1.  Under these circumstances, McCabe had a strong reason not to tell Comey on October 31 that he had authorized the disclosure to the WSJ about the CF Investigation:  it would have been an admission that McCabe had taken action relating to that investigation at exactly the time that McCabe's recusal from Clinton-related matters was under consideration by Comey.  Further, we found it extremely unlikely, as McCabe now claims, that he not only told Comey about his decision to authorize the disclosure, but that Comey thought it was a "good" idea for McCabe to have taken that action.

Sixth, no other senior FBI official corroborated McCabe's testimony that, among FBI executive leadership, "people knew that generally" he had authorized the disclosure.  Rather, multiple witnesses identified by McCabe told us that because of the information contained in the WSJ report, they did not believe it was an authorized disclosure.  They also said that had they heard about such an authorization they would have recalled it because it would have been so unusual.  Other than Special Counsel, *no* witness we interviewed told us that they knew that this disclosure had been authorized at the time.  We think it likely that at least

---

[9]  Just a few days earlier, McCabe had participated in a conference call with then-Attorney General Lynch regarding leaks during which McCabe "heard her use more forceful language" than she had ever used at any other time.

some FBI executives would have been aware of McCabe's authorization if he had told Comey what he had done.

Finally, Comey's testimony that McCabe did not tell him that McCabe had authorized the disclosure to the WSJ is entirely consistent with McCabe's statement to INSD on May 9 that he had "no idea where [the disclosure] came from" or "who the source was," as well as his claim to the OIG on July 28 that he was not aware that Special Counsel had disclosed the information to the WSJ. Conversely, McCabe's claim that he told Comey is not only inconsistent with his May 9 and July 28 statements to the INSD and OIG, respectively, but there would be no reason for McCabe to not tell INSD and OIG about his actions on those dates if he had already admitted them to Comey. Indeed, McCabe contacted the OIG on August 1 to attempt to correct his July 28 testimony only after he was made aware on July 28 that the OIG had text messages from Special Counsel that would likely enable the OIG to soon learn the truth about who authorized Special Counsel's actions.[10]

Taking all of these factors into account, we concluded that McCabe did not tell Comey on or around October 31 (or at any other time) that he (McCabe) had authorized the disclosure of information about the CF Investigation to the WSJ. Had McCabe done so, we believe that Comey would have objected to the disclosure. McCabe's disclosure was an attempt to make himself look good by making senior department leadership, specifically the Principal Associate Deputy Attorney General, look bad. While the disclosure may have served McCabe's personal interests in

---

[10] In a letter submitted by McCabe's counsel after reviewing a draft of this report, McCabe argues that "the OIG should credit Mr. McCabe's account over Director Comey's" and complains that the report "paints Director Comey as a white knight carefully guarding FBI information, while overlooking that Mr. McCabe's account is more credible for at least three key reasons. . . ." The first reason cited by McCabe as to why he should be believed over Comey is because he claims to have a "concrete recollection" of the conversation between the two of them on October 31, while he argues Comey does not. It is noteworthy that McCabe did not articulate such a "concrete recollection" during any of four prior interviews. That is, he did not mention it during his May 9 INSD interview, his July 28 OIG interview, his August 1 OIG call, or his August 18 INSD interview. It was not until his November 29 OIG interview – McCabe's fifth contact with INSD and the OIG about the WSJ article – that he first provided this "concrete recollection" of his conversation with Comey, which if true would have been critical for INSD and the OIG to know as soon as possible and in McCabe's interest to share as soon as possible. As we note in the report, none of the circumstantial evidence supports McCabe's claim, while the overwhelming weight of the circumstantial evidence support's Comey's recollection. In his submission, McCabe presented no evidence to corroborate his version of events. Instead, McCabe focuses entirely on attacking the credibility of Comey's recollection. We found his "concrete recollection" argument without merit. The second reason cited by McCabe as to why he should be believed over Comey is because Comey was distracted at the time because of his need on October 31 to deal with the Weiner laptop and Clinton E-mail Investigation issues. Given the significance of McCabe's disclosure, and the potential impact it had on FBI/DOJ relations, we have little doubt that, no matter how focused Comey was on the Clinton E-mail Investigation or Weiner laptop issues or other matters, Comey would have recalled McCabe telling him that he had been the source of the disclosure, if in fact McCabe had told Comey the truth. Finally, McCabe argues that Comey "would have every incentive to distance himself from this disclosure" due to McCabe's belief that the OIG is reviewing Comey's disclosure of other information to the media. However, McCabe provides no factual basis for this claim and fails to address the corroborating circumstances described in the report that support Comey's recollection. In the absence of any evidence supporting McCabe's claim, we do not credit it.

seeking to rebut the WSJ article on October 23 and to avoid another personally damaging WSJ story on October 30, it did so at the expense of undermining public confidence in the Department as a whole.  We do not believe that Comey would have been approving of such a disclosure by McCabe if he had been told about it.

For the same reasons, we reject the suggestion that Comey simply forgot or misremembered what McCabe told him.  If McCabe had told Comey that he had authorized this significant disclosure, we believe it would have surprised Comey and that Comey would have remembered it when the OIG interviewed him approximately 1 year later.  Similarly, we believe the other FBI executives would have remembered it too had they been told about it.

Comey did not testify that McCabe affirmatively and explicitly denied having authorized the disclosure, but rather that McCabe "in form or fashion" led him to believe that McCabe did not know how the WSJ got the account of the PADAG call, and "definitely didn't tell [Comey] he authorized it."  The FBI Offense code 2.5 (Lack of Candor – No Oath) does not require an explicit false statement to establish lack of candor.  It applies to "the failure to be fully forthright, or the concealment or omission of a material fact/information."  We concluded that McCabe lacked candor in concealing from Comey his role in authorizing the disclosure to the WSJ.[11]

---

[11] In response to his review of a draft of this report, counsel for McCabe argued that the OIG failed to satisfy the elements of FBI Offense Code 2.5, because McCabe's statements to then-Director Comey were part of a "casual interaction" and not as the result of "an interaction in which a supervisor was formally questioning an employee regarding his conduct."  We disagree.  Comey's testimony was that McCabe conveyed to Comey, in some form or fashion, that it was not McCabe who had disclosed to the WSJ the August 12 PADAG call confirming the existence of the previously unconfirmed CF Investigation.  The OIG does not accept that the FBI's Offense Code tolerates its Deputy Director's deceptive statements to the Director on an issue of importance to the Director and the FBI because the Deputy Director's lack of candor occurred in the context of a work conversation with the Director as opposed to "formal questioning."  In addition, although Offense Code 2.5 (Lack of Candor – No Oath) subjects employees to discipline for "[k]nowingly providing false information when making a verbal or written statement, not under oath, to a supervisor, . . . when the employee is questioned about his conduct or the conduct of another person," the FBI's Office of Professional Responsibility has previously taken the position in litigation that, "lack of candor is the generic term which has historically been used in FBI discipline which in its literal meaning means lack of forthrightness[.] . . . It can mean . . . lying to a supervisor, not under oath, about work performance."  See Ludlum v. Department of Justice, 278 F.3d 1280, 1284 (Fed. Cir. 2002).  Compare FBI Offense Codes 2.10, 2.11 (identifying misconduct relating to employee behavior in a formal "administrative matter," defined to include "internal disciplinary investigations, OIG investigations, OPR adjudications, or EEO Matters," as distinguished from the broader "question[ing] about his conduct or the conduct of another person" in Offense Code 2.5).  Moreover, the Preamble to the FBI's Offense Codes and Penalty Guidelines Governing FBI's Internal Disciplinary Process (Preamble) indicates that the Offense Codes and Penalty Guidelines "provide general categories of misconduct for which employees may be disciplined" and, further, stresses the "heightened behavioral and managerial expectations associated with SES personnel."  Preamble at 2, 4.  Accordingly, the OIG stands by its finding that McCabe lacked candor with the Director under Offense Code 2.5 and is subject to disciplinary action for such misconduct.

## 2.   Lack of Candor in Interview under Oath with INSD Agents on May 9, 2017

We concluded that McCabe lacked candor during an INSD interview under oath on May 9, 2017, when he falsely told the agents that he had not authorized the disclosure to the WSJ and did not know who did.

Two INSD investigators ███████████████████████████████████████ testified to the OIG that they clearly recalled McCabe telling them under oath on May 9 that he did not know who authorized the disclosure of the PADAG call to the WSJ.  The agents said that they provided McCabe with a copy of the article and had him initial it, gave him an opportunity to read it, and then discussed it with him.  According to the agents, McCabe told them he recalled the article, yet claimed he had "no idea where [the account of the PADAG call] came from" or "who the source was" for it.  Moreover, McCabe told the agents that he had previously told others about the August 12 call with PADAG, leaving INSD SSA1 with the impression that INSD would "not [] get anywhere by asking" McCabe how many people could have known about what appeared to be a private conversation between him and PADAG.  The agents' recollections are corroborated by contemporaneous notes of the May 9 interview taken by one of the agents and by the draft SSS that INSD prepared for McCabe's signature within a few days of the interview (which McCabe never signed, despite INSD's repeated efforts to get him to do so).  Moreover, McCabe's denial to the INSD agents was consistent with his responses to the OIG during his audio-recorded July 28 interview.  We found that these FBI employees – who had nothing to gain and everything to lose if they did anything but tell the truth regarding the interview of the then-FBI Deputy Director – accurately and truthfully recounted the details of what occurred during McCabe's May 9 interview.

By contrast, McCabe's account of this May 9 interview, which he provided to the OIG during his November 29 interview, was wholly unpersuasive.  McCabe claimed that the INSD agents "must have" gotten it wrong when they wrote that he told them on May 9 that he did not authorize the conversation and that he did not know who the source was.  Although McCabe said he did not believe that he denied authorizing the disclosure of the PADAG call during the interview, he could not provide any alternative account about what he actually said.  Rather, McCabe stated that he could not remember what he told the INSD investigators.  McCabe did not question the competence or good faith of the INSD interviewers, and also admitted that he could not explain why the investigators got the impression that McCabe had told them the WSJ article was an unauthorized leak.[12]

---

[12]  In a letter submitted by his counsel after reviewing a draft of this report, McCabe offers as an explanation for the inconsistent accounts of McCabe and the INSD agents that he was confused about what portion of the October 30 article he was being asked about, citing numerous other facts and quotes from anonymous FBI sources regarding the CF Investigation in the October 30 WSJ article.  The investigative record is clear as to the portion of the WSJ article about which the INSD agents were questioning McCabe.  According to INSD SSA 1's contemporaneous notes and testimony to the OIG, INSD specifically drew McCabe's attention to the portion of the October 30 WSJ article regarding the

However, in an apparent effort to provide an excuse for his untruthful responses to INSD, McCabe sought to portray the discussion about the October 30 article as essentially an afterthought by the agents. We found his description of the circumstances surrounding the interview to be demonstrably false. First, INSD-Section Chief flatly contradicted McCabe's claim that, at the end of an unrelated meeting, as the agents were walking out of his office, one of them (INSD-Section Chief) pulled McCabe aside and asked him a question or two about the October 30 article. Second, INSD-SSA1's two and half pages of notes of the meeting reflected that a significant portion of the interview related specifically to the account of the PADAG call that appeared in the October 30 article. Third, the agent that took the notes (INSD-SSA1) was not the agent (INSD-Section Chief) that McCabe claimed pulled him aside. Indeed, McCabe said that INSD-SSA1 and INSD-SSA2 (who did not attend the May 9 interview) were in the hallway outside of his office when he contends that INSD-Section Chief asked him about the disclosure of the PADAG call in the October 30 article, circumstances that INSD-Section Chief denied. Fourth, McCabe acknowledged that his initials were on a copy of the October 30 article that the agents gave him to review, as reflected in INSD-SSA1's notes.[13]

We also considered whether McCabe simply forgot that he had authorized the WSJ disclosure at the time of his May 9 INSD interview, and therefore made an honest mistake in telling INSD he did not know who did it. In three interviews under oath, including one with outside counsel, McCabe has never made this claim of a failed memory, and in any event we did not find this to be a persuasive explanation for his inaccurate statement given McCabe's other admissions.

First, McCabe acknowledged that the PADAG call was a very memorable event in McCabe's career. It involved a dramatic confrontation between McCabe and the Principal Associate Deputy Attorney General, one of the highest ranking officials in the Department. McCabe told the OIG that, despite his long career in the FBI, he had never had a conversation "like this one" with a high level Department of Justice official before or since August 12, 2016.

Second, McCabe told us this was the one and only time in his career that he authorized a disclosure to the media of an internal discussion with such a high level Department official.

Third, McCabe was deeply involved in the disclosure by Special Counsel to Barrett; this was not a fleeting event but rather one that McCabe was involved in for the entire week. McCabe learned by October 25 about Barrett's intention to write about the CF Investigation. By October 27, McCabe had authorized Special

---

August 12 PADAG call. SSA 1's testimony was further corroborated by INSD Section Chief who also noted that McCabe said he was disappointed that his conversation with the PADAG had appeared in the October 30 WSJ article. In addition, the draft SSS that the INSD agents sent to McCabe on May 12 stated that McCabe was "requested to evaluate and assess the content and accuracy of the first three paragraphs appearing on the last page" of the copy that McCabe acknowledged contained his initials, which was the portion of the article addressing the August 12 PADAG call.

[13] McCabe erroneously testified that INSD-SSA2 was present at the May 9 interview, but ███ was not.

Counsel and AD/OPA to discuss the investigation with Barrett.  McCabe then closely followed the progress of their discussions, including having a 51 minute call with Special Counsel on October 27 between Special Counsel's first and second calls that day with Barrett.  McCabe also had conversations with Special Counsel on October 28 close in time to her call with Barrett that day.  Then, on October 30, the day the article appeared, McCabe called both NY-ADIC and W-ADIC to admonish them for the leaks that appeared in the article.  The next day, October 31, McCabe had a conversation with Comey about the article.  Finally, on November 4, the day after another WSJ article concerning the CF Investigation, which again included information about the McCabe-PADAG call, McCabe again admonished NY-ADIC for leaks in that article.

Fourth, McCabe viewed the allegations that the WSJ reporter had told Special Counsel and AD/OPA that he would be writing about in the October 30 article as "incredibly damaging" to the credibility of the FBI, as well as an attack on his own integrity.  The October 30 WSJ article challenged McCabe's leadership of the FBI directly and personally, specifically his oversight of the CF Investigation.  We do not believe McCabe would have forgotten his own actions taken in connection with the publication of an article that was as memorable and personal as this one.

Fifth, McCabe acknowledged that INSD showed him the October 30 WSJ article at the outset of the discussion and gave him an opportunity to read it, and that he initialed the article and told the agents that he remembered it.

In light of the above circumstances, it seems highly implausible that McCabe forgot in May what he recalled in detail during his November OIG testimony:  that he made an active choice to authorize Special Counsel and AD/OPA to disclose the PADAG call as the "best evidence" to rebut the assertion that McCabe and the FBI ordered the termination of a criminal investigation due to Department of Justice pressure.  We therefore concluded that when McCabe told INSD in May that he did not know who authorized the disclosure to the WSJ, it was not due to a lack of memory.  In our view, the evidence is substantial that it was done knowingly and intentionally.

For these reasons, we concluded that McCabe violated FBI Offense Code 2.6 (Lack of Candor – Under Oath) when he falsely told INSD agents on May 9, 2017, that he did not know who authorized the disclosure of the PADAG call to the WSJ.

### 3.      Lack of Candor in Interview under Oath with OIG Investigators on July 28, 2017

We concluded that McCabe lacked candor during his OIG audio-recorded interview under oath on July 28, 2017, when he falsely stated that:  (a) he was not aware of Special Counsel being authorized to speak to reporters around October 30 and (b) he did not know, because he was out of town, "where [Special Counsel] was or what she was doing" during the relevant time period.

First, with regard to McCabe's claim that he was not aware of Special Counsel being authorized to speak to reporters around October 30, that claim was

essentially the same false denial that McCabe made to the two INSD agents on May 9, except this time the false denial was made in an audio-recorded interview. Thus, McCabe cannot deny that he made the statement, as he has attempted to do with regard to his May 9 response to INSD agents. Instead, McCabe asserted in his November 29 OIG interview that he "misspoke" during the July 28 interview because he was surprised by the topic being raised during that interview and had not thought about the October 30 article in "quite a long time." However, McCabe was shown the article and asked questions about it less than 3 months earlier in the May 9 INSD interview. Moreover, in neither the OIG July interview nor the May 9 INSD interview did McCabe indicate that he lacked recollection or needed more time to think about the matter. As Deputy Director, McCabe well knew the significance of OIG and INSD investigations, and of the importance of being truthful when questioned under oath by agents from those Offices. Moreover, McCabe was a trained law enforcement officer with roughly 20 years of law enforcement experience. On this record, we do not credit his claim that his unequivocal denials under oath, on two occasions within 3 months of one another, were the result of being surprised by the questions.

Second, with regard to McCabe's claim that he did not know where Special Counsel was or what she was doing during the relevant time period, FBI records show that McCabe was in frequent telephone and text communication with Special Counsel during that time period and had several communications with her regarding her calls with Barrett, including a 51 minute call after her first call with Barrett and a 23 minute call after her final call with Barrett. McCabe's own text messages reflect that McCabe was keenly interested to learn about the results of Special Counsel's calls with Barrett. We therefore found that McCabe's claimed ignorance regarding Special Counsel's activities on those days was demonstrably false.

For these reasons, we concluded that McCabe violated FBI Offense Code 2.6 (Lack of Candor – Under Oath) when he falsely told the OIG on July 28, 2017, that: (a) he was not aware of Special Counsel being authorized to talk to reporters and (b) he did not know what Special Counsel was doing at the relevant time because he was out of town.[14] In reaching this conclusion, we took note of the fact that

---

[14] In response to review a draft of this report, counsel for McCabe argued that, in asking McCabe about the October 27-30 texts between Special Counsel and DAD regarding the WSJ article, the OIG engaged in improper and unethical conduct, and violated an allegedly explicit agreement with McCabe that when he was interviewed by the OIG on July 28 he would not be questioned outside the presence of counsel with respect to matters for which he was being investigated. McCabe provides no evidence in support of his claim, and based on the OIG's review of the available evidence, including the transcript of McCabe's recorded OIG interview on July 28 and the OIG's contemporaneous notes, as described below, McCabe's claim is contradicted by the investigative record.

As an initial matter, at the time of the July 28 interview, McCabe was not a subject of an OIG investigation of disclosures in the October 30 WSJ article, nor did the OIG suspect him of having been the source of an unauthorized disclosure of non-public information related to that article. The OIG did not open its investigation of McCabe concerning the WSJ article until August 31, after being informed by INSD that McCabe had provided INSD agents with information on August 18, 2017, that contradicted the information that he had provided to INSD agents on May 9.

Second, the OIG has no record that McCabe stated in advance of the July 28 interview that he was represented by counsel. Moreover, the recording of the July 28 interview shows that at no time

McCabe called the OIG 4 days later, on August 1, and indicated that he had been thinking about the questions he had been asked and believed that he may have authorized Special Counsel to work with AD/OPA and Barrett on the follow-up WSJ article.  McCabe's call to the OIG on August 1 to attempt to correct his prior false testimony to the OIG was the appropriate course for him to take, and was a potentially mitigating factor in this misconduct.  However, as detailed in the next section, we found that when McCabe was given the opportunity during his November 29 OIG interview to address and acknowledge his prior false statements to the INSD and the OIG, McCabe made additional false statements.  Under these circumstances, we concluded that McCabe's August 1 call to the OIG does not alter our factual determination that his sworn testimony on July 28 lacked candor.

### 4.    Lack of Candor in Interview under Oath with OIG Investigators on November 29, 2017

We concluded that McCabe lacked candor during an OIG interview under oath on November 29, 2017, when he falsely told the OIG in a recorded interview that: (a) he told Comey on October 31, 2016, that he (McCabe) had authorized the disclosure to the WSJ and that Comey agreed it was a "good" idea; (b) he did not deny to the INSD agents on May 9 that he had authorized the disclosure to the WSJ; and (c) the May 9 INSD interview occurred at the end of an unrelated meeting

---

did McCabe give any indication that he was represented by counsel.   The transcript of the interview shows that the OIG informed McCabe, who has a law degree, that the interview was about "issues raised by the text messages" between Special Counsel and DAD, and that the OIG would not be asking McCabe questions about "other issues related to your recusal in the McAulliffe investigation . . . or any issues related to that."  McCabe responded "Okay" and did not articulate or request any further limitations on the questions he would answer.  The OIG added that "This is a voluntary interview.  What that means is that if you don't want to answer a question, that's fully within your rights."  That "will not be held against you . . . ."  The recording of McCabe's interview further demonstrates that the OIG was entirely solicitous of McCabe's requests not to respond to certain questions.  Towards the end of the interview, before beginning an area of questioning unrelated to Special Counsel/DAD texts or the WSJ article, the OIG prefaced his question to McCabe by stating "if you feel this is connected to the things that are making you uncomfortable, will you let me know?"  McCabe responded, "Yes. Yeah, you can ask, I'll let you . . . If I don't feel comfortable going forward, I'll let you know."  At a later point in the interview, after answering a number of questions unrelated to Special Counsel/DAD texts, McCabe expressed a preference for not answering further questions, and the OIG did not ask further questions on the topic.

Third, McCabe's submission mischaracterizes an October 4, 2017, email exchange with the OIG as evidencing that at the time of McCabe's July 28 OIG interview, McCabe was the subject of an OIG leak investigation.  As noted above, the OIG did not know about McCabe's involvement in the disclosure to the WSJ at the time of the July 28 interview, and only opened an investigation into his actions related to that disclosure on August 31, 2017, after the lack of candor referral to the OIG by INSD.

Lastly, despite having been questioned at length by the OIG on November 29, 2017, about the reasons for his false statements to the OIG on July 28, McCabe never once raised any of these issues. Moreover, the same counsel who submitted on behalf of McCabe these accusations of impropriety by the OIG was present for the entire OIG interview on November 29 yet never once raised any of these issues.  McCabe had every incentive to raise these issues as early as possible, and surely on November 29, when he was represented by counsel and was asked pointed questions by the OIG about his July 28 testimony denying that Special Counsel had been authorized to speak to reporters during that time period.  McCabe did not do so until nearly 7 months after the July 28 interview and nearly 3 months after the November 29 interview.

when one of the INSD agents pulled him aside and asked him one or two questions about the October 30 article.

First, with regard to his claim of having told Comey that he had authorized the disclosure, Comey stated precisely the opposite in his OIG interview, and the chronology and circumstances then existing (as described above) make it extraordinarily unlikely that McCabe did so and that Comey would simply have agreed after the fact with McCabe's disclosure and thought it was a good idea.  As detailed above, the overwhelming weight of evidence supported Comey's version of the conversation and not McCabe's.

Second, with regard to McCabe's claim that he did not deny authorizing the disclosure to the WSJ during the May 9 INSD interview, as noted previously the testimony of the INSD agents, the contemporaneous notes of the interview, the draft Signed Sworn Statement prepared 3 days later, and the similar false statements made by McCabe to the OIG on July 28 wholly undercut the contention by McCabe to the OIG on November 29.

Third, as explained above in Section A.2., we found that McCabe's description of the May 9 INSD interview about the October 30 WSJ article as essentially an afterthought, involving only a question or two from one of the INSD agents as the meeting was ending, was demonstrably false.

As such, we concluded that McCabe's testimony to the OIG lacked candor and violated FBI Offense Code 2.6 (Lack of Candor- Under Oath) when he falsely testified on November 29, 2017, that:  (a) he told Comey on October 31, 2016, that he (McCabe) had authorized the disclosure to the WSJ and that Comey agreed it was a "good" idea; (b) he did not deny to the INSD agents on May 9 that he had authorized the disclosure to the WSJ; and (c) the May 9 INSD interview occurred at the end of an unrelated meeting when one of the INSD agents pulled him aside and asked him one or two questions about the October 30 article.

**B.    Media Policies**

As the FBI's Deputy Director, McCabe was authorized to disclose the existence of the CF Investigation if the "public interest" exception found in Section 3.4 of the FBI's then-existing Policy on Media Relations applied.  Similarly, the Department's U.S. Attorneys' Manual included a public interest exception to the general prohibition on disclosing information about an ongoing criminal investigation.  However, we concluded that McCabe's decision to confirm the existence of the CF Investigation through an anonymously sourced quote, recounting the content of a phone call with a senior Department official in a manner designed to advance his personal interests, was clearly not within the public interest exception.  We therefore concluded that McCabe's disclosure of the existence of an ongoing investigation in this manner violated the FBI's and the Department's media policy and constituted misconduct.

As an initial matter, we found entirely unpersuasive McCabe's claim to us that he did not view the disclosure to the WSJ about the PADAG call as disclosing

the existence of the CF Investigation, and that therefore the FBI's prohibitions on commenting about a case did not apply.  He asserted that was not the purpose of the disclosure and "there really wasn't any discussion of the case, of the merits of the case, the targets and subjects of the case, so I did not see it as a disclosure about the Clinton Foundation case."  We found this explanation lacking in credibility.  The sole purpose for authorizing Special Counsel's and AD/OPA's disclosure about the August 12 PADAG conversation was to make the point that McCabe had stood up to the Department so that the FBI could continue to pursue its "validly predicated" CF Investigation.  The only possible conclusion that anyone could take from such a disclosure was confirmation that the FBI was conducting a CF Investigation, a fact Comey had pointedly refused to confirm in public testimony several months earlier.  McCabe himself acknowledged in his OIG testimony that his authorization of the disclosure of the PADAG call "clearly creates" the effect of confirming the existence of the CF Investigation.  We therefore concluded that FBI and Department policies were plainly applicable to the disclosure.

In our view, McCabe's best argument that his decision to disclose the August 12 conversation was at least arguably consistent with the public interest exception in the FBI and Department policies is that it was in the public interest for the FBI to rebut the allegation, from unnamed sources, that FBI leadership had shut down or suppressed the CF Investigation because of improper pressure from the Department.  This allegation was described by the WSJ reporter to Special Counsel and AD/OPA in the October 27 call and was ultimately reported in the October 30 WSJ article and in other press accounts.[15]  However, the manner in which McCabe addressed the anonymous allegations about the FBI's and the Department's handling of the CF Investigation reflected that McCabe was motivated to defend his integrity and objectivity in relation to the CF Investigation, which had been called into question, and not to advance any public interest.

Had McCabe's primary concern actually been to reassure the public that the FBI was pursuing the CF Investigation despite the anonymous claims in the article, the way that the FBI and the Department would usually accomplish that goal is through a public statement reassuring the public that the FBI is investigating the matter.  Of course, that would have required McCabe to alert Comey to the reporter's inquiry and to defer to Comey's and the Department's judgment as to whether the "public interest" exception applied and, even if it did, whether any such statement would be appropriate within days of the election.[16]  McCabe did not follow that course.  Instead, McCabe, without consulting Comey, authorized disclosure of the PADAG call on background to one news organization that was

---

[15] *See, e.g., FBI Agents Pressed Unsuccessfully for Probe of Clinton Foundation,* Washington Post (Oct 30, 2016).

[16] Moreover, had McCabe raised the issue with Comey at that time, we believe the same considerations that led Comey to exclude McCabe from the October 27 telephone call, and to McCabe's formal recusal on November 1 from the CF Investigation, would have caused Comey to prohibit McCabe from participating in any such discussions.  Indeed, as discussed above, FBI-GC stated that, had McCabe conferred with him on this matter, he would have counseled McCabe to avoid anything related to the CF Investigation, including authorizing disclosures to the press, given FBI-GC's and Comey's pending concerns about McCabe's potential appearance issues on Clinton-related matters.

directed primarily at enhancing McCabe's reputation at the expense of PADAG. Rather than reassuring the public, the disclosure led to further questions about leaks emanating from the FBI within days of an election, was part of a WSJ story that was predictably headlined, "FBI, Justice Feud in Clinton Probe," and resulted in another WSJ article on November 3.

In his testimony to the OIG, Comey disputed the notion that this disclosure was "in the best interest of the FBI." Comey acknowledged that one could argue that the disclosure shows that FBI leadership "is battling the pencil-pushing bureaucrats across the street [at Main Justice]" and "trying to do the right thing by way of the investigators in New York and Andy [McCabe] is their champion," but Comey said he "wouldn't have bought this argument" because it is outweighed by the fact that the disclosure would confirm the existence of a criminal investigation and harm FBI-DOJ relations. Likewise, FBI-GC told us that the problem with the disclosure was that "to put it bluntly, it throws DOJ under the bus," while accomplishing very little in terms of countering the narrative that the FBI was politically motivated. In FBI-GC's view, disclosure of this single conversation amounted to "a lower level effort to influence the narrative when the narrative is at a much higher level and going at a trajectory that it was not possible to change through something like this."

The FBI senior executives we interviewed suspected that this disclosure was an unauthorized leak because it disclosed a high-level conversation that appeared to serve McCabe at the expense of making DOJ look bad. As McCabe's own Chief of Staff stated:

> I just can't imagine that the Deputy would have authorized the leak. It just doesn't seem to serve, I mean, I guess it serves, it serves the purpose of the Deputy by saying, hey look, do you want us to shut this thing down? I guess it serves Andy in that way, but it really, it really highlights a dysfunction between the FBI and the, and DOJ. And to that end, it doesn't really serve the greater good.

We also found that McCabe's actions contemporaneous with the disclosure in October 2016, as well as those following it, reflected an understanding by McCabe that his authorization of the disclosure was not consistent with FBI policy. For example, on October 30 and November 4, following publication of the WSJ articles referencing his authorized disclosure about the PADAG conversation, McCabe called the NY-ADIC to complain about the CF Investigation leaks contained in those stories, without mentioning that he had authorized an anonymous disclosure rebutting the leaks and confirming the CF Investigation. Then, when questioned about the disclosure by INSD agents in May 2017, McCabe issued false denials regarding his involvement in it. Further, after it became apparent that the OIG knew about his role in the disclosure, McCabe sought to legitimize his actions by falsely claiming that he had told Comey that he authorized the disclosure and that Comey was fine with his decision.

We are mindful that McCabe was responding to anonymous, unauthorized leaks about the CF Investigation that may have originated from current or former

FBI agents.  However, ongoing, non-public FBI investigations are sometimes the subject of media reports, yet the FBI's official response to such reports is typically to refuse to confirm or deny the existence of the investigation, as then-Director Comey did in his July Congressional testimony.  Moreover, the FBI never officially confirms the existence of an ongoing criminal investigation through an anonymously quoted source.  We concluded that McCabe's decision to confirm the existence of the CF Investigation through an anonymously sourced quote in the WSJ, recounting the content of a telephone conversation between him and a Department official, served only to advance McCabe's personal interests and not the public interest, as required by FBI policy.  We therefore found that his actions violated applicable FBI and Department policies and constituted misconduct.[17]

## C.    Conclusion

As detailed in this report, the OIG found that then-Deputy Director Andrew McCabe lacked candor, including under oath, on multiple occasions in connection with describing his role in connection with a disclosure to the WSJ, and that this conduct violated FBI Offense Codes 2.5 and 2.6.  The OIG also concluded that McCabe's disclosure of the existence of an ongoing investigation in the manner described in this report violated the FBI's and the Department's media policy and constituted misconduct.

The OIG is issuing this report to the FBI for such action that it deems to be appropriate.

---

[17]  We note also that section 1-7.530 of the USAM required McCabe to "consult and obtain approval from the United States Attorney or Department Division handling the matter prior to disseminating any information to the media."  Because we concluded that the disclosure was not authorized by FBI and Department policies, we did not need to assess how this specific USAM provision impacted McCabe's action.



The Department of Justice Office of the Inspector General (DOJ OIG) is a statutorily created independent entity whose mission is to detect and deter waste, fraud, abuse, and misconduct in the Department of Justice, and to promote economy and efficiency in the Department's operations.

To report allegations of waste, fraud, abuse, or misconduct regarding DOJ programs, employees, contractors, grants, or contracts please visit or call the **DOJ OIG Hotline** at oig.justice.gov/hotline or (800) 869-4499.

**U.S. DEPARTMENT OF JUSTICE OFFICE OF THE INSPECTOR GENERAL**
950 Pennsylvania Avenue, Northwest
Suite 4760
Washington, DC  20530-0001

| **Website** | **Twitter** | **YouTube** |
|---|---|---|
| oig.justice.gov | @JusticeOIG | JusticeOIG |

Also at Oversight.gov



**U.S. Department of Justice**

Office of the Inspector General

---

December 21, 2018

Anne L. Weismann
aweismann@citizensforethics.org

Subject:      Freedom of Information/Privacy Act Request [19-OIG-102]

Dear Ms. Weismann:

This is in response to your March 19, 2018 request to the Federal Bureau of Investigation (FBI) under the Freedom of Information Act (FOIA).  Specifically, your request seeks "all documents related to any investigation or inquiry conducted by the FBI's Office of Professional Responsibility ("OPR") of, involving, or relating to former FBI Deputy Director Andrew McCabe, who was fired by Attorney General Sessions on March 16, 2017."  The FBI located records that originated with the Department of Justice Office of the Inspector General (OIG) and referred those records to our office for direct response to you.

This is a partial response to your request.  We have determined that certain portions of the records should be withheld from disclosure pursuant to FOIA exemptions (b)(6), which protects information about individuals that would constitute a clearly unwarranted invasion of personal privacy; (b)(7)(A), which protects records or information compiled for law enforcement purposes to the extent that the production of such law enforcement records or information could reasonably be expected to interfere with enforcement proceedings; (b)(7)(C), which protects records or information compiled for law enforcement purposes to the extent that the production of such law enforcement records or information could reasonably be expected to constitute an unwarranted invasion of personal privacy; and (b)(7)(E), which protects records or information compiled for law enforcement purposes to the extent that production of such records or information would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law.  Consequently, please find enclosed that information which can be released pursuant to your request.

We are aware that this matter is in litigation and we will continue to process the referred records as expeditiously as possible and in compliance with all applicable court orders.

If you are not satisfied with my response to this request, you may administratively appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, Suite 11050, 1425 New York Avenue, NW, Washington, DC 20530-0001, or you may submit an appeal through OIP's FOIAonline portal by creating an account on the following web site: https://foiaonline.regulations.gov/foia/action/public/home.  Your appeal must be postmarked or electronically transmitted within 90 days of the date of my response to your request.  If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."

For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the FOIA. See 5 U.S.C. 552(c) (2006 & Supp. IV 2010).  This response is limited to those records that are subject to the requirements of the FOIA.  This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist.

You may contact our FOIA Public Liaison, Deborah Waller at (202) 616-0646 for any further assistance of your request.  Additionally, you may contact the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services they offer.  The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at (202) 741-5770; toll free at 1-877-684-6448.

Sincerely,

*Ofelia C. Perez*

Ofelia C. Perez
Government Information Specialist
Office of the General Counsel

Enclosure

2

**(b) (6), (b) (7)(A), (b) (7)(C)** Transcript

and Notes

**(b) (6), (b) (7)(A), (b) (7)(C)**

2630-HQ- **(b) (6), (b) (7)(C)** 12

```
 1              UNITED STATES DEPARTMENT OF JUSTICE

 2                 OFFICE OF THE INSPECTOR GENERAL

 3

 4      ------------------------------X

 5    IN RE:                          :

 6    INTERVIEW OF  (b) (6), (b) (7)(A), (b) (7)(C)    :

 7      ------------------------------X

 8                                              (b) (6), (b) (7)(A), (b) (7)(C)

 9                                              Washington, D.C.

10    Interview of

11                      (b) (6), (b) (7)(A), (b) (7)(C)

12

13    By the U.S. Department of Justice, Office of the Inspector

14    General, at the Department of Justice Building, beginning

15    at 2:30 p.m. before:

16

17            FOR THE OFFICE OF THE INSPECTOR GENERAL:

18            (b) (6), (b) (7)(C) , Oversight and Review Division

19            (b) (6), (b) (7)(C)      Oversight and Review Division

20

21            FOR THE WITNESS:

22            NONE

23

24

25
```

DEPOSITION SERVICES, INC.
12321 Middlebrook Road, Suite 210
Germantown, Maryland 20874
Phone:   (301) 881-3344



Page 2

```
 1                I N D E X
 2              EXHIBITS
 3   EXHIBIT NUMBER          PAGE NUMBER
 4   None.
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

(b) (6), (b) (7)(A), (b) (7)(C)

Page 3

(b) (6), (b) (7)(A), (b) (7)(C)

17  (b) (6), (b) (7)(A), (b) (7)(C) Currently, I am assigned to FBI
18  Headquarters Inspection Division, Internal Investigations
19  Section, as a Supervisory Special Agent.
20  (b) (6), (b) (7)(A), (b) (7)(C)

Page 5

(b) (6), (b) (7)(A), (b) (7)(C)







**Page 14**

1 (b) (6), (b) (7)(A), (b) (7)(C)
2
3
4
5 (b) (6), (b) (7)(A), (b) (7)(C)  And this
6 actually, as I understand it, is our notes from an
7 interview with Mr. McCabe.
8 (b) (6), (b) (7)(A), (b) (7)(C)  Um-hmm.
9 (b) (6), (b) (7)(C)  Andrew G. McCabe.  And just for
10 the record, it is a three-page document, handwritten notes
11 dated in the upper-right corner 5-slash-9-slash-17, 2:30
12 P, for p.m. I believe.
13 (b) (6), (b) (7)(A), (b) (7)(C)  Yes.
14 (b) (6), (b) (7)(A), (b) (7)(C)
15 (b) (6), (b) (7)(A), (b) (7)(C)  Um-hmm.
16 (b) (6), (b) (7)(C)  Do you recognize this handwriting?
17 (b) (6), (b) (7)(C)  Yes, I do.
18 (b) (6), (b) (7)(C)  Are these your handwritten notes?
19 (b) (6), (b) (7)(A), (b) (7)(C)  Yes, they are my handwritten notes.
20 (b) (6), (b) (7)(A), (b) (7)(C)
21
22
23
24
25

**Page 15**

1 (b) (6), (b) (7)(A), (b) (7)(C)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 16**

1 (b) (6), (b) (7)(A), (b) (7)(C)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16 (b) (6), (b) (7)(C)  So then what prompted you or
17 (b) (6), (b) (7)(A), (b) (7)(C)  to discuss the October 30th, 2016 Wall
18 Street Journal article at this interview?
19 (b) (6), (b) (7)(A), (b) (7)(C)
20
21
22
23
24
25

**Page 17**

1 (b) (6), (b) (7)(A), (b) (7)(C)
2
3
4
5
6 (b) (6), (b) (7)(A), (b) (7)(C)  And
7 she brought out the article from the Wall Street Journal
8 and handed it to him.
9 (b) (6), (b) (7)(A), (b) (7)(C)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25





Page 22

(b) (6), (b) (7)(A), (b) (7)(C)

Page 23

(b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(C) Okay. So the first page in your

Page 24

(b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(C) But do you see how this one document you're looking at --

(b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(A), (b) (7)(C) but it does appear to have his initials (b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(A), (b) (7)(C) Yes. And I would venture a guess

Page 25

why. Because this is the one that was provided to him by

(b) (6), (b) (7)(A), (b) (7)(C)

Min-U-Script®

(6) Pages 22 - 25



**Page 26**

1 [(b) (6), (b) (7)(C)] -- that he is saying he remembers
2 this and that it was an accurate conversation with [redacted]
3 [(b) (6), (b) (7)(C)] the Principal Deputy Attorney
4 General.
5 [(b) (6), (b) (7)(A), (b) (7)(C)] Um-hmm. Yeah, I think I mention
6 here, read article during interview that he, we paused and
7 let him read, read the article. I mean, he read the
8 article, not just that piece. [(b) (6), (b) (7)(A), (b) (7)(C)]
9 [(b) (6), (b) (7)(A), (b) (7)(C)]
10 [(b) (6), (b) (7)(C)] And then do the next two entries
11 in your notes reflect that he, Mr. McCabe stated that he
12 read the article when it came out and he remembered this?
13 [(b) (6), (b) (7)(A), (b) (7)(C)] Yeah. That he had read it when it
14 came out. [(b) (6), (b) (7)(A), (b) (7)(C)]
15 [(b) (6), (b) (7)(A), (b) (7)(C)]
16
17
18
19 [(b) (6), (b) (7)(A), (b) (7)(C)] And he, is he indicating
20 that those, the last three paragraphs that you directed
21 his attention were an accurate conversation?
22 [(b) (6), (b) (7)(A), (b) (7)(C)] Yes. He remembered this, and I
23 even put that in quotations. And accurate conversation,
24 yes.
25 [(b) (6), (b) (7)(C)] So when he said he remembered

**Page 27**

1 this, you think this is the article?
2 [(b) (6), (b) (7)(A), (b) (7)(C)] I think he's talking about the
3 article. Yes.
4 [(b) (6), (b) (7)(A), (b) (7)(C)]
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23 [(b) (6), (b) (7)(C)] And who is, is anyone saying no
24 idea where it came from? What's that notation?
25 [(b) (6), (b) (7)(A), (b) (7)(C)] I believe, if memory serves me,

**Page 28**

1 that would be Mr. McCabe telling us that he had no idea
2 where it came from what the source was from it.
3 [(b) (6), (b) (7)(A), (b) (7)(C)]
4
5
6
7 [(b) (6), (b) (7)(C), (b) (7)(A)] I remember that it was very, the
8 whole interaction was very short, you know, with, with
9 this article.
10 [(b) (6), (b) (7)(A), (b) (7)(C)]
11
12
13
14
15
16 [(b) (6), (b) (7)(C)] Roughly how much time was spent in
17 total on this Wall Street Journal article discussion?
18 [(b) (6), (b) (7)(C), (b) (7)(A)] If memory serves me, about five to
19 seven minutes.
20 [(b) (6), (b) (7)(C)] Okay.
21 [(b) (6), (b) (7)(C), (b) (7)(A)] Because we I, I don't know about
22 [redacted] but I walked in with the anticipation that he,
23 he was a victim of that as well.
24 [(b) (6), (b) (7)(C)] Um-hmm.
25 [(b) (6), (b) (7)(A), (b) (7)(C)] And, you know, I, we present it to

**Page 29**

1 him, and he said that, no, he, he wasn't aware of the, the
2 nature of it. He wasn't, he didn't know, when he read it,
3 he, or the second time he recognized it, he didn't, he
4 didn't know about the article. He didn't know who gave it
5 out. He didn't authorize it. He didn't direct anybody to
6 give it out. But it was like a flowing, did you, were you
7 aware, did you authorize somebody? It was like a, I
8 didn't even need notes on that part because what I
9 reflected in his statement afterwards, along with his
10 changes, was just like one paragraph that said, hey, we
11 showed it to him, and, and again, he's the victim. He
12 didn't know about this. He didn't authorize it. He
13 didn't know who was the one that, who the source of the
14 article was.
15 [(b) (6), (b) (7)(C)] So a victim of the, of a leak,
16 what seemed to be a leak.
17 [(b) (6), (b) (7)(A), (b) (7)(C)]
18 [(b) (6), (b) (7)(A), (b) (7)(C)] He just said that he
19 didn't know, and it was my interpretation that, well if
20 you didn't know, you didn't authorize it. [(b) (6), (b) (7)(A), (b) (7)(C)]
21 [(b) (6), (b) (7)(A), (b) (7)(C)]
22
23
24
25

Page 30

(b) (6), (b) (7)(A), (b) (7)(C)

Page 32

(b) (6), (b) (7)(A), (b) (7)(C)

11 he almost, like, waved away when I said well, there's
12 no way I can, I can remember how many people were in there
13 or how many people I told the story to, because I had
14 related the story so many times that I couldn't, he
15 couldn't even begin to tell me how many people he told
16 about. So, it's almost to me got the impression that I'm
17 not going to get anywhere asking him, well, how many know
18 of this, because he's told so many people about it
19 already.
20    And again, it was still, he's the victim. (b) (6), (b)

(b) (6), (b) (7)(A), (b) (7)(C)

Page 31

(b) (6), (b) (7)(A), (b) (7)(C)

14 (b) (6), (b) (7)(C) So does that paragraph that you
15 just read, does that reflect an accurate statement that
16 Mr. McCabe made to you at the time of the May 9th
17 interview?
18 (b) (6), (b) (7)(A), (b) (7)(C) That accurately reflects the
19 information that he conveyed to me. (b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(A), (b) (7)(C)

Page 33

(b) (6), (b) (7)(A), (b) (7)(C)









Page 42

(b) (6), (b) (7)(A), (b) (7)(C)

Page 43

(b) (6), (b) (7)(A), (b) (7)(C)

Page 44

(b) (6), (b) (7)(A), (b) (7)(C)

Page 45

(b) (6), (b) (7)(A), (b) (7)(C)

7  (b) (6), (b) (7)(A), (b) (7)(C)  And in light of
8  what has transpired with the (b) (6), (b) (7)(A), (b) (7)(C) interview (b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(A), (b) (7)(C)

18  (b) (6), (b) (7)(A), (b) (7)(C)  I want to look, I
19  want to show you this article.  (b) (6), (b) (7)(A), (b) (7)(C)
20  (b) (6), (b) (7)(A), (b) (7)(C)
21  (b) (6), (b) (7)(A), (b) I want to ask you about this article because
22  we're, we're having conflicting information.  And so I
23  need to know from you, did you authorize this article?
24  (b) (6), (b) (7)(A), (b) (7)(C)  Did you authorize it?
25  And he looked at it, and he read it.  And as



**Page 46**

1  nice as could be, he said yep.  Yep, I did.  (b) (6), (b)(7)(A), (b) (7)(C)
2  (b) (6), (b) (7)(A), (b) (7)(C)
3
4
5
6
7
8
9
10
11  (b) (6), (b) (7)(A), (b) (7)(C), (b) (7)(E)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 48**

1  find out who amongst your ranks of trusted people would,
2  would do something like that.  And he kind of just looked
3  down, kind of nodded, and said, yeah, I'm sorry.
4  (b) (6), (b) (7)(A), (b) (7)(C)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 47**

1  (b) (6), (b) (7)(A), (b) (7)(C), (b) (7)(E)
2
3
4
5  (b) (6), (b) (7)(A), (b) (7)(C)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22  (b) (6), (b) (7)(A), (b) (7)(C)  I remember saying to him, at, I
23  said, sir, you understand that we put a lot of work into
24  this based on what you've told us.  I mean, and I even
25  said, long nights and weekends working on this, trying to

**Page 49**

1  (b) (6), (b) (7)(A), (b) (7)(C)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 50

(b) (6), (b) (7)(A), (b) (7)(C)

Page 52

(b) (6), (b) (7)(A), (b) (7)(C)

Page 51

(b) (6), (b) (7)(A), (b) (7)(C)

Page 53

(b) (6), (b) (7)(A), (b) (7)(C)

16   (b) (6), (b) (7)(C)   And his response to you after you
17   gave him the article and you mentioned that you guys were
18   getting conflicting info, you said his response was yep,
19   yep, I did.  What again was the question that you posed to
20   him exactly?  Did he authorize --
21   (b) (6), (b) (7)(A), (b) (7)(C)   Yes.
22   (b) (6), (b) (7)(C)
23   (b) (6), (b) (7)(A), (b) (7)(C)   Did you authorize, and I,
24   the last page that we're looking at, did you, did you,
25   you authorize that?  And he read it, and yes.   (b) (6), (b) (7)(A), (b) (7)(C)



Page 54

(b) (6), (b) (7)(A), (b) (7)(C)

8  And then when I asked him about that, that part
9  there where, you know, about that telephone conversation,
10 he did say, yeah, he did say that, I don't recall
11 specifically authorizing that, or telling that, but I said
12 were you, you know, is that your authorization? And
13 again, he still, he took, he took responsibility, or he
14 took ownership of it.

(b) (6), (b) (7)(A), (b) (7)(C)

Page 55

(b) (6), (b) (7)(A), (b) (7)(C)

23 (b) (6), (b) (7)(A), (b) (7)(C), he, you have in quotes, okay with it?
24 (b) (6), (b) (7)(A), (b) (7)(C)  Yeah. That's his quote.
25 (b) (6), (b) (7)(A), (b) (7)(C)

Page 56

(b) (6), (b) (7)(A), (b) (7)(C)

Page 57

(b) (6), (b) (7)(A), (b) (7)(C)



Page 58

(b) (6), (b) (7)(A), (b) (7)(C)

Page 60

(b) (6), (b) (7)(A), (b) (7)(C)

23 (b) (6), (b) (7)(A), (b) (7)(C) when I put in here in quotes, okay
24 with it. It must have been a question something like how
25 do you feel about that now, in hindsight? Well, how do

Page 59

(b) (6), (b) (7)(A), (b) (7)(C)

Page 61

1 you feel about this, this information and the, and the
2 level of, you know, detail in this? And he said he's okay
3 with it. (b) (6), (b) (7)(A), (b) (7)(C)
(b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(A), (b) (7)(C)



Page 62

(b) (6), (b) (7)(A), (b) (7)(C)

Page 64

(b) (6), (b) (7)(A), (b) (7)(C)

Page 63

(b) (6), (b) (7)(A), (b) (7)(C)

Page 65

(b) (6), (b) (7)(A), (b) (7)(C)

15  (b) (6), (b) (7)(A), (b) (7)(C)   And I remember that
16  sent it out, but she didn't send it to
17  Andrew McCabe, sent it to the wrong
18  (b) (6), (b) (7)(A), (b) (7)(C)





























Page 122

(b) (6), (b) (7)(A), (b) (7)(C)

Page 124

(b) (6), (b) (7)(A), (b) (7)(C)

Page 123

(b) (6), (b) (7)(A), (b) (7)(C)

Page 125

```
 1    C E R T I F I C A T E
 2    DEPOSITION SERVICES, INC. hereby certifies that
 3    the foregoing pages represent an accurate transcript of
 4    the electronic sound recording of the proceedings before
 5    the Department of Justice, Office of Inspector General in
 6    the matter of:
 7
 8    Interview of (b) (6), (b) (7)(A), (b) (7)(C)
 9
10
11
12                        _____
13    (b) (6), (b) (7)(C) Transcriber
14
15    (b) (6), (b) (7)(A), (b) (7)(C)
16
17    Date  _____
18
19
20
21
22
23
24
25
```

(b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(A), (b) (7)(C)

Deposition Services, Inc.

(b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(A), (b) (7)(C)

Deposition Services, Inc.

(b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(A), (b) (7)(C)



(b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(A), (b) (7)(C)



(b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(A), (b) (7)(C)



**U.S. Department of Justice**

Office of the Inspector General

---

February 25, 2019


Anne L. Weismann
aweismann@citizensforethics.org

Subject:     Freedom of Information/Privacy Act Request [19-OIG-102]

Dear Ms. Weismann:

This is in response to your March 19, 2018 request to the Federal Bureau of Investigation (FBI) under the Freedom of Information Act (FOIA). Specifically, your request seeks "all documents related to any investigation or inquiry conducted by the FBI's Office of Professional Responsibility ("OPR") of, involving, or relating to former FBI Deputy Director Andrew McCabe, who was fired by Attorney General Sessions on March 16, 2017." The FBI located records that originated with the Department of Justice Office of the Inspector General (OIG) and referred those records to our office for direct response to you.

This is a partial response to your request, supplementing a partial response we previously made to you on December 21, 2018. We have determined that certain portions of the records should be withheld from disclosure pursuant to FOIA exemptions (b)(6), which protects information about individuals that would constitute a clearly unwarranted invasion of personal privacy; (b)(7)(A), which protects records or information compiled for law enforcement purposes to the extent that the production of such law enforcement records or information could reasonably be expected to interfere with enforcement proceedings; (b)(7)(C), which protects records or information compiled for law enforcement purposes to the extent that the production of such law enforcement records or information could reasonably be expected to constitute an unwarranted invasion of personal privacy; and (b)(7)(E), which protects records or information compiled for law enforcement purposes to the extent that production of such records or information would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law. Consequently, please find enclosed that information which can be released pursuant to your request.

We are aware that this matter is in litigation and we will continue to process the referred records as expeditiously as possible and in compliance with all applicable court orders.

If you are not satisfied with my response to this request, you may administratively appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, Suite 11050, 1425 New York Avenue, NW, Washington, DC 20530-0001, or you may submit an appeal through OIP's FOIAonline portal by creating an account on the following web site: https://foiaonline.regulations.gov/foia/action/public/home.  Your appeal must be postmarked or electronically transmitted within 90 days of the date of my response to your request.  If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."

For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the FOIA. See 5 U.S.C. 552(c) (2006 & Supp. IV 2010).  This response is limited to those records that are subject to the requirements of the FOIA.  This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist.

You may contact our FOIA Public Liaison, Deborah Waller at (202) 616-0646 for any further assistance of your request.  Additionally, you may contact the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services they offer.  The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at (202) 741-5770; toll free at 1-877-684-6448.

Sincerely,

*Ofelia C. Perez*

Ofelia C. Perez
Government Information Specialist
Office of the General Counsel

Enclosure

DO MCCABE

REINTERVIEW                    (1-3)          5/9/17 2:30p

w/ SC

[(b) (6), (b) (7)(A), (b) (7)(C)]

[black redaction box]

WSJ / DEVLIN BARRETT ARTICLE     (EXHIBIT #5)

PROVIDED W/ ARTICLE FOR REVIEW.

LAST Pg. 1-3 PARAGRAPHS.

READ ARTICLE — DURING INTERVIEW.

← READ WHEN CAME OUT.

[(b) (7)(A) black redaction box]

AFTER READING PB

REMEMBERED "THIS" —

ACCURATE → CONVERSATION

[(b) (6), (b) (7)(C) black redaction box]

         PRIN — DAG   SALLY YATES (RIGHT HAND)

[(b) (7)(A) black redaction box]

NO IDEA WHERE CAME FROM

[(b) (6), (b) (7)(A), (b) (7)(C) black redaction box]

[(b) (6), (b) (7)(A), (b) (7)(C) black redaction box]



(b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(A), (b) (7)(C)

TOLD STORY OF INTERACTION —
MULTIPLE PEOPLE —

(b) (7)(A)



(b) (6), (b) (7)(A), (b) (7)(C)

08/18/2017

MCCABE

DO OFFICE, 5:00

D.O AUTHORIZE — BACKGROUND

W/ SSA

(b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(A), (b) (7)(C)

**[redacted]**

(b) (6), (b) (7)(A), (b) (7)(C)

AUTHORIZED — **[redacted]** FOR INFO IN

BARRETT'S ARTICLES

·0130/16

(b) (6), (b) (7)(A), (b) (7)(C)

**[redacted]**

OK WITH IT.   → MCCABE RE CONTENTS OF ARTICLE

(b) (6), (b) (7)(A), (b) (7)(C)

**[redacted]**

(b) (6), (b) (7)(A), (b) (7)(C)

[REDACTED]

AND MCCABE THAT IIS WOULD TAKEN A
DIFFERENT COURSE HE HAS TOLD ME
& SC (b) (6), (b) (7)(A), (b) (7)(C) THAT HE AUTHORIZED THE
ARTICLE IN WSJ —
            SAID "I KNOW" BUT THERE WAS ALOT
GOING ON AT THE TIME.

. TOLD HIM A LOT OF EFFORT INC WEEKENDS
  SPENT ON TRY TO ID THE LEAKER-
  SAID → SORRY

(b) (7)(A)

[REDACTED]

# KOBRE & KIM LLP

**1919 M STREET, NW**
**WASHINGTON, DC 20036**
**WWW.KOBREKIM.COM**

TEL +1 202 664 1900

NEW YORK
LONDON
HONG KONG
SHANGHAI
SEOUL
WASHINGTON DC
SAN FRANCISCO
MIAMI
CAYMAN ISLANDS
BVI

(b) (6), (b) (7)(A), (b) (7)(C)

**CONFIDENTIAL FOIA TREATMENT REQUESTED**

**BY ELECTRONIC MAIL**

Michael E. Horowitz
Inspector General
Office of the Inspector General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

Re:   **Draft Report Regarding FBI Deputy Director Andrew G. McCabe**

Dear Mr. Horowitz:

Thank you for providing us with the opportunity to review the draft report (the "Draft Report") prepared by the Office of the Inspector General ("OIG") relating to FBI Deputy Director Andrew G. McCabe, (b) (6), (b) (7)(A), (b) (7)(C)



CONFIDENTIAL FOIA TREATMENT REQUESTED
We request that this submission be handled confidentially pursuant to the Privacy Act of 1974, 5 U.S.C. § 552a.

263D-HQ- (b) (6), (b) (7)(C) -5



Michael E. Horowitz
(b) (6), (b) (7)(A), (b) (7)(C)
Page 2

**I.   Mr. McCabe's July 28, 2017 OIG Interview By Assistant Inspector General** (b)(6), (b)
(b) (6), (b) (7)(A), (b) (7)(C)

As discussed in further detail below, (b) (6), (b) (7)(A), (b) (7)(C) questioning of Mr. McCabe during the July 28, 2017 OIG interview was improper, unethical, and violated his explicit agreement with Mr. McCabe that he would not be questioned outside the presence of counsel with respect to the matters for which he was being investigated. (b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(A), (b) (7)(C)



CONFIDENTIAL FOIA TREATMENT REQUESTED
We request that this submission be handled confidentially pursuant to the Privacy Act of 1974, 5 U.S.C. § 552a.

Michael E. Horowitz
(b) (6), (b) (7)(A), (b) (7)(C)
Page 3

(b) (6), (b) (7)(A), (b) (7)(C)



Michael E. Horowitz
(b) (6), (b) (7)(A), (b) (7)(C)
Page 4

(b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(A), (b) (7)(C)

CONFIDENTIAL FOIA TREATMENT REQUESTED
We request that this submission be handled confidentially pursuant to the Privacy Act of 1974, 5 U.S.C. § 552a.

Michael E. Horowitz
(b) (6), (b) (7)(A), (b) (7)(C)

Page 5

(b) (6), (b) (7)(A), (b) (7)(C)

CONFIDENTIAL FOIA TREATMENT REQUESTED
We request that this submission be handled confidentially pursuant to the Privacy Act of 1974, 5 U.S.C. § 552a.

Michael E. Horowitz

(b) (6), (b) (7)(A), (b) (7)(C)

Page 6

(b) (6), (b) (7)(A), (b) (7)(C)

CONFIDENTIAL FOIA TREATMENT REQUESTED
We request that this submission be handled confidentially pursuant to the Privacy Act of 1974, 5 U.S.C. § 552a.

Michael E. Horowitz
(b) (6), (b) (7)(A), (b) (7)(C)

Page 7

(b) (6), (b) (7)(A), (b) (7)(C)

CONFIDENTIAL FOIA TREATMENT REQUESTED
We request that this submission be handled confidentially pursuant to the Privacy Act of 1974, 5 U.S.C. § 552a.

Michael E. Horowitz
(b) (6), (b) (7)(A), (b) (7)(C)
Page 8

(b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(A), (b) (7)(C)

In this case, a lack of candor finding is inappropriate because (b) (6), (b) (7)(A), (b) (7)(C)
(b) (6), (b) (7)(A), (b) (7)(C) there are significant reasons to believe that there was room for misunderstandings during the interview.

First, the WSJ article at issue does not contain only a single "leak." To the contrary, there are approximately 24 separate facts and quotes from anonymous FBI sources in the article. (b) (6), (b) (7)(C)
(b) (6), (b) (7)(A), (b) (7)(C)

Michael E. Horowitz
(b) (6), (b) (7)(A), (b) (7)(C)

Page 9

(b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(A), (b) (7)(C)   it is not clear that the INSD agents were specifically referring to the PADAG call when they generally asked Mr. McCabe about the source of "leaks" in the article. Even if that was the INSD agents' understanding at the time, it is not clear that Mr. McCabe understood them to be focused solely on the PADAG call, as opposed to any of the other disclosures that he expressed concern about. (b) (6), (b) (7)(A), (b) (7)(C)
(b) (6), (b) (7)(A), (b) (7)(C)

(b) (6), (b) (7)(A), (b) (7)(C)

CONFIDENTIAL FOIA TREATMENT REQUESTED
We request that this submission be handled confidentially pursuant to the Privacy Act of 1974, 5 U.S.C. § 552a.

Michael E. Horowitz
(b) (6), (b) (7)(A), (b) (7)(C)

Page 10

(b) (6), (b) (7)(A), (b) (7)(C)

CONFIDENTIAL FOIA TREATMENT REQUESTED
We request that this submission be handled confidentially pursuant to the Privacy Act of 1974, 5 U.S.C. § 552a.

(b) (6), (b) (7)(C), (b) (7)(A)

# Interviews, Signed Sworn Statement, and Notes

263 D - HQ - (b) (6), (b) (7)(C) - 13

██ (b) (7)(A)
**Washington, District Of Columbia**

I, ██ (b) (6), (b) (7)(C), (b) (7)(A) ██ having been duly sworn by ██ (b) (6), (b) (7)(C), (b) (7)(A)

██ (b) (6), (b) (7)(C), (b) (7)(A) ██ hereby make the following

statement to ██ and ██ (b) (6), (b) (7)(C), (b) (7)(A) ██ whom I know to be

██ (b) (7)(A) of the Federal Bureau of Investigation (FBI), assigned to

the Inspection Division (INSD), Internal Investigations Section

(IIS):

██ (b) (6), (b) (7)(C), (b) (7)(A) ██

    I understand that this is an internal investigation

regarding an allegation that Subject(s) Unknown may have provided

information to the media concerning a statement made by FBI

Executive Management ██ (b) (7)(A), (b) (7)(E) ██

██ (b) (7)(A), (b)(7)(E) ██



██ (b) (6), (b) (7)(C), (b) (7)(A) ██

(b) (7)(A)
Washington, District Of Columbia

(b) (6), (b) (7)(C), (b) (7)(A)

(b) (7)(A)
Washington, District Of Columbia

(b) (6), (b) (7)(C), (b) (7)(A)

(b) (7)(A)

Washington, District Of Columbia

(b) (6), (b) (7)(C), (b) (7)(A)

(b) (7)(A)
**Washington, District Of Columbia**

(b) (6), (b) (7)(C), (b) (7)(A)

(b) (7)(A)

Washington, District Of Columbia

(b) (6), (b) (7)(C), (b) (7)(A)

(b) (7)(A)

**Washington, District Of Columbia**



On August 7, 2017, I was interviewed (b)(7)(A) under oath and pursuant to the terms of the previously signed (b)(7)(A)

(b) (6), (b) (7)(C), (b) (7)(A)

(b) (7)(A)
**Washington, District Of Columbia**

(b) (6), (b) (7)(C), (b) (7)(A)

The interviewing agents showed me the printout of an internet article entitled, ''FBI in Internal Feud Over Hillary Clinton Probe,'' by Devlin Barrett, The Wall Street Journal (WSJ), dated October 30, 2016. *I read and initialed the copy of the article, which is attached to my statement as Exhibit #4.*

(b) (6), (b) (7)(C), (b) (7)(A)

(b) (7)(A)
**Washington, District Of Columbia**



(b) (6), (b) (7)(C), (b) (7)(A)

Due to the inaccuracies in the October 24, 2016 story, DD
McCabe asked AD ████████ and me to work with Mr. Barrett ''on
background'' basis and provide a framework to help shape his next
article. (b) (7)(A)



(b) (7)(A)

To the best of my recollection and according to my notes, AD
████████ and I engaged in two telephone calls with Mr. Barrett on
October 27, 2016 and October 28, 2016. I believe we spent
approximately one hour on the telephone with Mr. Barrett each
day. (b) (6), (b) (7)(C), (b) (7)(A)

(b) (6), (b) (7)(C), (b) (7)(A)                                    *At the*

*request of the interviewing agents, I produced copies of my*
*notes, which are attached hereto as Exhibit #6.*

With respect to the three highlighted paragraphs on the last
page of the exhibit, I presume the portions of those paragraphs
(b) (6), (b)
(7)(C), (b)
(7)(A)

(b) (7)(A)
**Washington, District Of Columbia**

(b) (6),
(b) (7)
(C), (b) that read, ''[a]ccording to a person familiar with the probes,''
''according to one person close to Mr. McCabe,'' and ''people
familiar with the conversation,'' are referring to me and AD
         The ''validly predicated investigation'' that DD McCabe
was referencing in the August 12, 2016 telephone call was the New
York Office (NYO) investigation into the Clinton Foundation.   The
call referenced in the article is the same call with PADAG
(b) (6), (b) (7)(C) about which the interviewing agents asked me.

(b) (6), (b) (7)(C), (b) (7)(A)

(b) (7)(A)
**Washington, District Of Columbia**

(b) (6), (b) (7)(C), (b) (7)(A)



(b) (7)(A)
**Washington, District Of Columbia**

(b) (6), (b) (7)(C), (b) (7)(A)

Sworn to and subscribed before me on the 15ᵗʰ day of August, 2017, in Washington, District Of Columbia.

(b) (6), (b) (7)(C), (b) (7)(A)

(b) (6), (b) (7)(C), (b) (7)(A)

Ex 1

(b) (6), (b) (7)(A), (b) (7)(C)

1

(b) (6), (b) (7)(C), (b) (7)(A)

(b) (7)(A)

(b) (7)(A)





(b) (7)(A)





(b) (6), (b) (7)(C), (b) (7)(A)

MOI

(b) (7)(A)

**U.S. Department of Just..  .**
Office of the Inspector General                    **MEMORANDUM OF INVESTIGATION**

| **Case Number:** | **Reporting Office:** |
|---|---|
| E2017012 | OFFICE OF OVERSIGHT AND REVIEW |

Re: Interview of ████████████████ Assistant Director of the Counterintelligence Division, FBI Headquarters.

On ████████ Investigative Counsel ████████████ conducted a telephonic interview of ████████████████ to determine if he had any knowledge regarding the disclosure of the August 12, 2016 telephone conversation between FBI Deputy Director Andrew G. McCabe and an unnamed senior Department official on the Clinton Foundation investigation that appeared in the Wall Street Journal on October 30, 2016.

## BACKGROUND

In his OIG interview on November 28, 2017, Deputy Director McCabe identified ████████████████ as someone who "possibly" knew that McCabe authorized ████████████████ and ████████████████ to disclose the account of his August 12, 2016 telephone call with ████████████ regarding the Clinton Foundation investigation to the Wall Street Journal.

████████████████████████████████████████████████

## DISCUSSION

████████████████
related the following with respect to the October 30, 2016 Wall Street Journal article:

1.    ████did not know who the source was who disclosed the account of August 12 call between McCabe and the unnamed DOJ official re: Clinton Foundation investigation.

| Investigative Counsel and Signature: | | | Date: |
|---|---|---|---|

2.   (b) (6), (b) (7)(C), (b) (7)(A)

3.   ▮▮▮ was never told and never heard that someone at the FBI had been authorized to disclose the account of the August 12 call to the Wall Street Journal. ▮▮▮ "absolutely would have remembered" something like that.

4.   ▮▮▮ was never told and never heard that someone at the FBI had been authorized to talk to the Wall Street Journal about the Clinton Foundation case. ▮▮▮ "would have remembered that because it's not the norm."

# Toll Records, Texts, E-mails (including (b) (6), (b) (7)(C), (b) (7)(A) E-mail)

2635-HQ- (b) (6), (b) (7)(C) -16



| Date UTC | Internal Phone Number | Type of Message | From | To | Body |
|---|---|---|---|---|---|
| | | | (b) (6), (b) (7)(C), (b) (7)(A) | | |
| 2016-10-27 16:06:39, Thu | (b) (6), (b) (7)(C), (b) (7)(A) | OUTBOX | | | Are you in with wsj now? |
| 2016-10-27 16:19:42, Thu | | INBOX | | | Going there now. I WI call you immediately after re call with devlin. (b) (6), (b) (7)(C), (b) (7)(A) |
| 2016-10-27 16:24:56, Thu | | OUTBOX | | | (b) (7)(A) |
| (b) (7)(A) | | (b) (7)(A) | | | |
| 2016-10-27 17:25:41, Thu | | INBOX | | | Can you talk now? |

| Date UTC | Internal Phone Number | Type of Message | From | To | Body |
|---|---|---|---|---|---|
| 2016-10-27 17:49:13, Thu | (b) (6), (b) (7)(C), (b) (7)(A) | INBOX | (b) (6), (b) (7)(C), (b) (7)(A) | | |
| 2016-10-27 18:38:43, Thu | | OUTBOX | | | |
| 2016-10-27 18:39:14, Thu | | INBOX | | | |
| 2016-10-27 20:22:50, Thu | | OUTBOX | | | |
| 2016-10-27 20:23:17, Thu | | INBOX | | | |
| 2016-10-27 20:36:55, Thu | | INBOX | | | |



| Date UTC | Internal Phone Number | Type of Message | From | To | Body |
|---|---|---|---|---|---|
| | | | (b) (6), (b) (7)(C), (b) (7)(A) | | |
| 2016-10-27 21:23:02, Thu | (b) (6), (b) (7)(C), (b) (7)(A) | INBOX | | | We're done. He's going to look at his story again and we'll circle back with him in the morning. |
| 2016-10-28 17:33:46, Fri | | INBOX | | | Just got off with barrett. Give me a call here. |
| (b) (7)(A) | | (b) (7)(A) | | | |
| | | | | | (b) (6), (b) (7)(C), (b) (7)(A) |

3 of 4

| Date UTC | Internal Phone Number | Type of Message | From | To | Body |
|---|---|---|---|---|---|

(b) (6), (b) (7)(C), (b) (7)(A)



| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 1 | 2016-10-27 21:23:02, Thu | (b) (6), (b) (7)(C), (b) (7)(A) | INBOX | We're done. He's going to look at his story again and we'll circle back with him in the morning. | sms | | (b) (6), (b) (7)(C), (b) (7)(A) | |

(b) (6), (b) (7)(C), (b) (7)(A)

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 10 | 2016-10-28 01:57:44, Fri | (b) (6), (b) (7)(C), (b) (7)(A) | OUTBOX | I spoke to both. Both understand that no decision will be made on recusal until I return and weigh in (b) (6), (b) (7)(C), (b) (7)(A) | sms | | (b) (6), (b) (7)(C), (b) (7)(A) | |

(b) (6), (b) (7)(C), (b) (7)(A)



| | A | C | D | E | F | H |
|---|---|---|---|---|---|---|
| | | | | | | This is all ███ \nJustice officials warned FBI that Comey\u2019s decision to update Congress was not consistent with department policy - The Washington Post \nhttps://www.washingtonpost.com/world/national-security/justice-officials-warned-fbi-that-comeys-decision-to-update-congress-was-not-consistent-with-department-policy/2016/10/29/cb179254-9de7-11e6-b3c9-f662adaa0048_story.html?hpid=hp_hp-top-table-main_campaignprint-810pm%3Ahomepage%2Fstory - |
| 34 | 2016-10-30 13:50:53, Sun | (b) (6), (b) (7)(C), (b) (7)(A) | INBOX | (b) (6), (b) (7)(C), (b) (7)(A) | | Yeah, I saw it. Makes me feel WAY less bad about throwing him under the bus in the forthcoming CF article. |
| 35 | 2016-10-30 13:56:06, Sun | | OUTBOX | | | |
| 36 | (b) (7)(A) | | (b) (7)(A) | | | (b) (7)(A) |
| 37 | | | | | | |



|   | A | B | C | D | E | F | G | H | I | J |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | (b) (7)(A) | (b) (6), (b) (7)(C), (b) (7)(A) | (b) (7)(A) | (b) (6), (b) (7)(C), (b) (7)(A) | | | | | | (b) (7)(A) |
| 2 | | | | | | | | | | |
| 3 | | | | | | | | | | |
| 4 | | | | | | | | | | |
| 5 | | | | | | | | | | |
| 6 | | | | | | | | | | |
| 7 | 2016-10-27 16:15:09, Thu | | INCOMING | | | | | | | |
| 8 | 2016-10-27 18:54:47, Thu | | OUTGOING | | | | | | | 00:51:32 |
| 9 | (b) (7)(A) | | | | | | | | | (b) (7)(A) |
| 10 | 2016-10-27 20:38:10, Thu | | OUTGOING | | | | | | | 00:06:30 |
| 11 | (b) (7)(A) | | (b) (7)(A) | | | | | | | (b) (7)(A) |
| 12 | | | | | | | | | | |
| 13 | | | | | | | | | | |
| 14 | | | | | | | | | | |
| 15 | 2016-10-27 22:47:20, Thu | | OUTGOING | | | | | | | 00:04:57 |
| 16 | (b) (7)(A) | | (b) (7)(A) | | | | | | | (b) (7)(A) |
| 17 | | | | | | | | | | |
| 18 | | | | | | | | | | |
| 19 | 2016-10-27 23:06:28, Thu | | OUTGOING | | | | | | | 00:06:22 |
| 20 | (b) (7)(A) | | (b) (7)(A) | | | | | | | (b) (7)(A) |
| 21 | | | | | | | | | | |
| 22 | | | | | | | | | | |
| 23 | | | | | | | | | | |
| 24 | | | | | | | | | | |
| 25 | | | | | | | | | | |
| 26 | | | | | | | | | | |
| 27 | | | | | | | | | | |
| 28 | | | | | | | | | | |
| 29 | | | | | | | | | | |
| 30 | | | | | | | | | | |
| 31 | | | | | | | | | | |
| 32 | | | | | | | | | | |
| 33 | | | | | | | | | | |
| 34 | | | | | | | | | | |
| 35 | | | | | | | | | | |
| 36 | | | | | | | | | | |
| 37 | | | | | | | | | | |
| 38 | | | | | | | | | | |
| 39 | | | | | | | | | | |

| | A | B | C | D | E | F | G | H | I | J |
|---|---|---|---|---|---|---|---|---|---|---|
| 40 | 2016-10-28 17:38:16, Fri | (b) (6), (b) | OUTGOING | (b) (6), (b) (7)(C), (b) (7)(A) | | | | | | 00:23:40 |
| 41 | (b) (7)(A) | (7)(C), (b) (b) (7)(A) | | | | | | | | (b) (7) |
| 42 | | (7)(A) | | | | | | | | (A) |
| 43 | | | | | | | | | | |
| 44 | | | | | | | | | | |
| 45 | | | | | | | | | | |
| 46 | | | | | | | | | | |

(b) (6), (b) (7)(C), (b) (7)(A)

**From:** (b) (6), (b) (7)(C), (b) (7)(A) (OIG)
**Sent:** Tuesday, August 01, 2017 5:43 PM
**To:** (b) (6), (b) (7)(C), (b) (7)(A)
(b) (6), (b) (7)(C), (b) (7)(A)

**Subject:** Call from A/Director McCabe

On Tuesday August 1 I received a call from Acting Director McCabe. He wanted to provide some additional recollections about matters we had discussed during his interview on July 27.

First, he stated that he believes that (b) (6), (b) (7)(C), (b) (7)(A) may have been authorized by him to work with AD (b) (6), (b) (7)(C), (b) (7)(A) (Public Affairs) and to speak with the WSJ for the late October article. He said he had worked with (b) (6), (b) (7)(A) on a previous WSJ article earlier in the month when they spent the day trying to correct inaccuracies. At the time the second article was being prepared, McCabe was out of town (b) (6), (b) (7)(C), (b) (7)(A). He believes he may have authorized (b) (6), (b) (7)(A) to work with (b) (6), (b) (7)(A) and speak to Devlin Barrett (the WSJ reporter) because she had previously worked with McCabe on the issues raised by his wife's political campaign and was very familiar with those issues. (b) (6), (b) (7)(C), (b) (7)(A)
(b) (6), (b) (7)(C), (b) (7)(A)

(b) (6), (b) (7)(C), (b) (7)(A)  He said (b) (6), (b) (7)(A) would be familiar with (b) (6), (b) (7)(A) role and authority to speak.

(b) (6), (b) (7)(C), (b) (7)(A)

1



(b) (6), (b) (7)(C), (b) (7)(A)

------- Original message -------
From: "Mccabe, Andrew G. (DO) (FBI)" <Andrew.McCabe@ic.fbi.gov>
Date: 11/3/16 9:36 PM (GMT-05:00)
To: (b) (6), (b) (7)(C), (b) (7)(A)
Subject: Wsj

# Secret Recordings Fueled FBI Feud in Clinton Probe

This is the latest WSJ article.

Call me tomorrow.

1

0.7.453.76967

**Message**

| | |
|---|---|
| **From:** | Mccabe, Andrew G. (DO) (FBI) [/O=FBI/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=AGAGMCCA] |
| **Sent:** | 10/26/2016 12:45:57 AM |
| **To:** | (b) (6), (b) (7)(C), (b) (7)(A) |
| **Subject:** | RE: Wsj |

Thanks

-------- Original message --------
From: (b) (6), (b) (7)(C), (b) (7)(A)
Date: 10/25/16 7:48 PM (GMT-05:00)
To: "Mccabe, Andrew G. (DO) (FBI)" <Andrew.McCabe@ic.fbi.gov>
Subject: RE: Wsj

Not tonight or tomorrow's paper. Will have better idea tomorrow.

------- Original message --------
From: "Mccabe, Andrew G. (DO) (FBI)" <Andrew.McCabe@ic.fbi.gov>
Date: 10/25/16 7:42 PM (GMT-05:00)
To: (b) (6), (b) (7)(C), (b) (7)(A)
Subject: Wsj

Any news on the next article? Do we think anything else will break tomorrow?

(b) (6), (b) (7)(C), (b) (7)(A)

**From:** Barrett, Devlin [mailto:devlin.barrett@wsj.com]
**Sent:** Monday, October 24, 2016 11:58 AM
**To:** (b) (6), (b) (7)(C), (b) (7)(A)
**Subject:** Happy Monday

(b) (6), (b) (7)(C), (b) (7)(A)

Also, a followup:

(b) (7)(A)

I'm also told that in the summer, McCabe himself gave some instruction as to how to proceed with the Clinton Foundation probe, given that it was the height of election season and the FBI did not want to make a lot of overt moves that could be seen as going after her or drawing public attention to the probe.
How accurate are those descriptions?
anything else I should know?

(b) (7)(A)

--
Devlin Barrett
Wall Street Journal
o (202) 862-6624
c (202) 617-6330
t: @devlinbarrett